UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CIV 3020

BOARD OF TRUSTEES OF THE IMPERIAL
COUNTY EMPLOYEES' RETIREMENT
SYSTEM, in its capacity as a fiduciary of the
Imperial County Employees' Retirement
System, individually and on behalf of all others
similarly situated,

        Plaintiff,

  v.

JPMORGAN CHASE BANK, N.A.,

        Defendant.

Civil Action No.

JURY TRIAL DEMANDED



## CLASS ACTION COMPLAINT

The Board of Trustees of the Imperial County Employees' Retirement System ("Plaintiff"), in its capacity as a fiduciary of the Imperial County Employees' Retirement System ("Plan"), files this Class Action Complaint against Defendant JPMorgan Chase Bank, N.A. ("JPMorgan" or "Defendant") and alleges as follows[1]:

## I.    SUMMARY OF THE ACTION

1.      Plaintiff brings this action on behalf of the of the Class (as that term is defined below), which consists of all persons or entities, other than plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), that participated in Defendant's securities lending program and that incurred losses relating to Defendant's investment in medium-term notes of Sigma Finance, Inc.  Through this action, Plaintiff seeks to recover such losses on behalf of the Plan and on behalf of all members of the Class ("Class Members" or the "Plans").

2.      Each Class Member, including the Plan, was a party to a substantially similar securities lending agreement with JP Morgan (each a "Securities Lending Agreement").  Pursuant to these Securities Lending Agreements, Defendant loaned securities owned by Class Members to third-party borrowers in return for cash collateral.  Defendant then invested, at its sole discretion, the cash collateral in an effort to earn an investment return on the cash collateral in excess of the rebate paid to the third-party borrowers.  In return, Defendant received, as compensation, a percentage of the revenues

---

[1] Plaintiff's allegations are based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge.

generated for each Class Member. Defendant referred to these activities as its "Securities Lending Program."

3.     At all times relevant hereto, Defendant was a fiduciary of the Plan and other Class Members because it exercised authority and/or control with respect to the management of assets, including the investment of cash collateral through the Securities Lending Program.

4.     As a fiduciary of the Plans, Defendant was required to discharge its obligations with respect to Class Members (a) solely in the interest of the Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) act in accordance with all applicable documents and instruments.

5.     These fiduciary duties are commonly referred to as the duties of loyalty, exclusive purpose, and prudence. They are the highest known to the law.

6.     Further, because the funds invested for Class Members consisted of collateral that must be returned to borrowers upon repayment of the underlying securities loans, each of the Securities Lending Agreements required Defendant to, *inter alia*, (a) safeguard principal, (b) maintain adequate liquidity, and (c) discharge its duties with respect to the investment of the collateral with appropriate care, skill, prudence, and diligence.

3

7.      Despite these objectives and duties, Defendant invested and lost a substantial portion of the cash collateral provided to Class Members in medium-term notes ("MTNs") issued by Sigma Finance, Inc. ("SFI"). SFI is a Delaware corporation organized for the sole purpose of issuing debt securities for its Cayman Islands parent company, Sigma Finance Corporation ("Sigma"). The debt securities – in this case MTNs – were secured only by a "floating lien" on the assets of Sigma, which was subject to subordination to the lien interests of Sigma's other creditors.

8.      Shortly after Defendant purchased a substantial amount of Sigma MTNs using the cash collateral held by Class Members, analysts following Sigma and other structured investment vehicles ("SIVs") like Sigma warned that the lack of liquidity in the credit market and sharp declines in the market value of assets backing many SIVs threatened their financial viability.

9.      At least by December 2007, analysts predicted that Sigma would not be able to repay the MTNs Defendant had purchased Class Members' collateral upon maturity. However, Defendant wholly ignored these reports and continued to hold these rapidly declining investments.

10.      The news continued to worsen for Sigma in January 2008 and the months that followed. Still, Defendant buried its head in the sand and refused to heed the warning signs.

11.      The analyst predictions proved true as Sigma's creditors seized over $25 billion of its approximately $27 billion of assets in late September and early October

2008, leaving approximately $1.9 billion as security for approximately $6.2 billion of outstanding MTNs and other secured debt. By October 6, 2008, Sigma was in receivership.

12.     Further, JP Morgan's involvement with Sigma MTNs was not limited to its investments on behalf of the Plan. Rather, while JP Morgan was investing the Plan's money in Sigma MTNs, JP Morgan also earned substantial fees and interest through providing short term repurchase agreements ("repo transactions") financing for Sigma. Accordingly: (a) JP Morgan's financial interest as Sigma's repo financier was in direct conflict with its fiduciary responsibility to the Plan; and (b) JP Morgan was clearly in a position to know of Sigma's problems. Further, money market funds managed by JP Morgan also held Sigma MTNs. Rather than protect the assets of the Plan and the Class, JP Morgan supported Sigma with repo financing, then pulled the plug on this financing after its own money market funds received their final payments on their Sigma MTN holdings.

13.     Defendant's actions vis-à-vis Plaintiff and members of the Class constitute a breach of Defendant's fiduciary duties owed to the Plan and breach of Defendant's obligations under the common law and the Securities Lending Agreements. As a direct result of Defendant's fiduciary breaches, the Plan and the other Class Members suffered significant losses.

14.     Accordingly, this is a proposed class action under FED. R. CIV. P. 23 on behalf of all non-ERISA Plans that were parties to Securities Lending Agreements with JP

Morgan and suffered losses due to JP Morgan's breaches of its fiduciary duties and other common law and contractual obligations during the Class Period. Plaintiff brings this action on behalf of the Plan and on behalf of similar situated non-ERISA plans throughout the country that were subject to, and affected by, JP Morgan's conduct in the same manner and with the same debilitating effect. Plaintiff alleges that JP Morgan, having undertaken a fiduciary role with respect to the Plan and members of the Class, breached its duties of prudence, loyalty, and exclusive purpose as described herein.

15.    Plaintiff seeks losses to these plans for which JP Morgan is liable. In addition, Plaintiffs seeks other equitable relief from JP Morgan, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

## II.    PARTIES

16.    The Board is the administrator and a named fiduciary of the Plan. The Plan was created for the sole purpose of providing retirement benefits to employees of Imperial County, California.

17.    Defendant JPMorgan Chase Bank, N.A. is a national banking association organized and existing under the laws of the United States. Defendant's principal place of business is located at 270 Park Avenue, New York, New York 10017-2070. Defendant is the securities lending agent for the Plan and all Class Members.

### III.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are 100 or more members in the proposed class; (2) many class members have a different citizenship from that of Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant resides in this district and because a substantial part of the events giving rise to the claims asserted herein occurred in this district.

### IV.    FACTS

#### A.    Defendant's Securities Lending Agreements

20.    Pursuant to a Securities Lending Agreement with the Plan, a copy of which is attached as Exhibit A, and pursuant to substantially similar Securities Lending Agreements with other Class Members, Defendant loaned securities held by the Plan and Class Members to third-party borrowers—typically, those seeking to short sell the securities. According to the Securities Lending section of JP Morgan's website, the stated purpose for its Securities Lending Program is to "obtain an attractive return while minimizing risk." *See* http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (accessed on March 25, 2009).

7

21.     Pursuant to the Securities Lending Agreements, in return for the loaned securities, the Plan and Class Members received from the borrowers cash collateral in an amount exceeding the market value of the loaned securities.

22.     Defendant then invested this cash directly or in one or more collective investment vehicles that Defendant created and maintained and for which it served as the investment manager. For example, the Plan's cash collateral received from JP Morgan's lending of its shares was invested in The JP Morgan Chase Bank Cash Collateral Fund, which was also commonly referred to as the "CashCo Fund."

23.     The Plan and other Class Members were to receive a *pro rata* share of all revenues earned by the direct investment or by the collective investment vehicles in which their cash collateral was invested, less the expenses and fees taken by Defendant and the rebate paid to the borrowers of the Class Members' securities.

24.     Defendants received, as compensation for its services, a percentage of the net revenues generated through the Securities Lending Program for each Class Member.

## B.    Objectives and Guidelines for Investment of Cash Collateral

25.     Because Defendant invested cash collateral – essentially borrowed money – that had to be returned to the borrowers of the securities upon return of those securities, Defendant was contractually required to invest the cash collateral conservatively and prudently, consistent with the Securities Lending Program's primary objective of safeguarding principal.

8

26.    In particular, the Securities Lending Agreements required Defendant to follow certain guidelines in investing the cash collateral (the "Investment Guidelines").

27.    The Investment Guidelines define the CashCo Fund as a short term, fixed income fund.  Fixed income funds are typically regarded by investors as safe – generally, a way to generate a modest return with limited risk and the preservation of capital. Investors typically regard fixed income funds as being dependable because they limit the level of risk while preserving capital.  Typical investments for a fixed income fund include shorter-term, higher-quality debt instruments that tend to have less risk, such as bonds, certificates of deposit and U.S. Treasury securities.  As such, the Investment Guidelines for the CashCo Fund limited JP Morgan's investments to only instruments that were highly rated by rating agencies.

28.    Accordingly, consistent with Defendant's fiduciary, common law and contractual duties, the key objectives for the management of the cash collateral generated by the Securities Lending Program are to: (a) safeguard principal; (b) maintain a diversified portfolio of investments and adequate liquidity; and (c) consistent with these objectives, to optimize the spread between the collateral earnings and the rebate paid to the borrowers of securities.

**C.**    **Applicable Standard of Care**

29.    Defendant owes the Plan and other Class Members fiduciary obligations by virtue of its authority and control over the assets of the Plan and Class Members and its discretionary authority over investment of cash collateral under the Securities Lending Agreements.

30.    Additionally, Defendant agreed that the CashCo Fund "shall consist solely of assets of tax-exempt defined benefit and defined contribution retirement plans of: (a) entities governed by ERISA and (b) public entities." Because the CashCo Fund included comingled assets of ERISA plans, Defendant was obligated to manage its investment of the entire CashCo Fund in accordance with ERISA-mandated fiduciary standards. Accordingly, the fiduciary duties that Defendant owes to the Plan and other Class Members regarding its management of the CashCo Fund were no less than the fiduciary duties owed by Defendant to ERISA plans.

31.    As a fiduciary, Defendant was required to discharge its obligations with respect to the Plan and other Class Members (a) solely in the interest of Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the applicable documents and instruments.

32.    Defendant agreed to assume liability for losses incurred by the Plan that were caused by Defendant's negligence, bad faith or willful misconduct.

**D.    Defendant's Investment of Cash Collateral**

33.    Since as early as January 2007, Defendant invested billions of dollars of cash received as collateral for loans of Class Members' securities.

34.    Defendant invested the cash collateral both directly and through "collective investment vehicles" including, without limitation, the CashCo Fund. A collective investment vehicle permits investors to combine their assets and invest the pooled funds. Defendant acted as the investment manager for all such vehicles.

35.    Defendant then directly and through these collective investment vehicles used the cash collateral received by Class Members to purchase the MTNs of SFI.

36.    SFI, a Delaware corporation, is the wholly owned subsidiary of Sigma Finance Corporation ("Sigma"), an entity organized and existing under the laws of the Cayman Islands. SFI was organized for the sole purpose of issuing and selling debt securities as a nominee for Sigma. SFI is not permitted by its certificate of incorporation to engage in any other business.

37.    The MTNs issued by SFI are guaranteed by Sigma and secured by a "first priority floating lien" in the assets of Sigma, except with respect to assets used as collateral for repurchase agreements ("repo transactions")[2] or other borrowing

---

[2] In a repo transaction, the SIV sells a portion of its assets to a "repo counterparty," typically a bank with the highest possible short term rating. At the same time, the SIV agrees to repurchase the assets at a specific point in the future (the repo term) and pays interest to the repo counterparty over the term of the transaction. To protect itself from default by the SIV, the repo counterparty insists on a "haircut" being

arrangements (subject to the funds raised thereby being at least equal to 90% of the then current market value of such assets) in which case the lien will rank second in respect of such assets.

38.    Sigma is an SIV managed by the British firm Gordian Knot Limited.

39.    An SIV issues short term debt, typically in the form of MTNs and commercial paper, to finance the acquisition of long term high yielding assets, such as mortgage backed securities, earning revenues based on the difference in yield between the debt it issues and the investment assets its owns.

40.    During the summer of 2007, Sigma was the largest of approximately 30 SIVs in the world.  As of July 2007, Sigma had outstanding debt of approximately $52 billion.

**E.    The Unmistakable – Yet Unheeded – Warnings Concerning Sigma**

41.    As early as August 2007, just a few months after Defendant invested millions of dollars of Class Members' cash collateral in the Sigma MTNs, analysts sounded alarm bells for the health of SIVs.  According to Citi analysts, liquidity in the credit markets and sharp declines in the market value of assets backing many SIVs had already caused forced selling of assets among the world's major SIVs to support their revolving debt.

42.    On June 21, 2007, two hedge funds, created and managed by a subsidiary of the former investment bank Bear Stearns & Co. ("Bear Stearns"), whose investment

---

applied to assets.  This means that the SIV must post collateral valued in excess of the amount the SIV borrows from the repo counterparty.

strategy relied on financing its investment activities by borrowing against long term assets like mortgage-backed securities, faced a liquidity crisis as the hedge funds' lenders were reluctant to lend money to an entity whose collateral was principally based on mortgage-backed securities. These hedge funds had to be bailed out by their parent, Bear Stearns, and in August 2007 were shut down.

43.    The collapse of the Bear Stearns hedge funds fueled a liquidity crisis among SIVs that held assets similar to these hedge funds. Between August and October 2007, more than a dozen SIVs failed, following downgrades by rating agencies over the quality of their assets.

44.    On October 26, 2007, Fortune Magazine published an article sharply critical of mutual funds that had invested in SIVs, referring to them as "shadowy debt funds." The article stated:

> The fact the SIVs stumbled so quickly shows that they weren't built with anywhere near enough capital or commitments of back-up funding. Fund management companies should have looked beyond the rating and basically asked themselves: Does a SIV really have the same creditworthiness as U.S. Treasuries, also rated AAA? And they should also have noted how skewed the SIVs were to short-term funding, since that is a common mistake in investing.

*See* Peter Eavis, *Risky Money Market Fund Bets May Be Illegal*, Fortune (October 26, 2007). Similarly, JP Morgan knew or should have known that the Sigma SIVs were an imprudent investment for the assets of the Plan and the Class.

45.    In October 28, 2007, another observer noted:

> Some money-market funds got involved in SIVs by lending them money. Now, though, as it has become more difficult for the SIV wheel to keep

spinning, some money-market fund managers have grown concerned that SIVs are less likely to repay the money they borrowed.

*See* Tim Paradis, *Money-Market Fund Investors Fret about Their SIV Risk*, Washington Post, p. F02 (October 28, 2007), *available at*: http://www.washingtonpost.com/wp-dyn/content/article/2007/10/27/AR2007102700123.html (accessed March 25, 2009).

46.    Of the many SIVs that failed, the bulk were subsidiaries of, or had been set up by, major banks.  As such, these banks—including Citigroup and HSBC—essentially absorbed their failures.

47.    Sigma, however, was unique in that it was a standalone entity and had no investment or commercial bank backing it.  Nevertheless, while many of the smaller SIVs were collapsing in the fall of 2007, Sigma barely managed to stay alive during this period because it had a large asset base that could be sold as its debt obligations matured, much of its outstanding debt was in the form of MTNs maturing in 2008, and it had eliminated market-value triggers from its governance that forced the other failing SIVs (who had not eliminated these provisions) to sell their assets and wind down in 2007 as the values of their underlying assets declined.  *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, *Bloomberg News* (Apr. 8, 2008).  Sigma removed these triggers in 2003 because its founders recognized that falling prices of the securities held by Sigma was a "contagion risk" that could infect and threaten the viability of Sigma.  However, the removal of these triggers simply prolonged Sigma's death.

48.    Faced with an inability to issue new MTNs, Sigma was forced to finance its activities using repo transactions which encumbered an overwhelming majority—

14

approximately $25 billion—of its $27 billion in assets to the detriment of its MTN

holders (who were subordinated to the security interests of the repurchase agreement

counterparties). Sigma's survival was contingent on these repo counterparties continuing

to lend money to Sigma collateralized against Sigma's existing asset base. This was,

however, a temporary survival strategy.

      49.    As the *Financial Times* wrote on December 17, 2007, Sigma, despite

weathering the first SIV liquidity storm, was certain to be caught up in a second liquidity

storm when its MTNs came due:

> The funding problems for the structured investment vehicles (SIVs) that
> have been at the centre of this year's liquidity troubles are far from over in
> spite of a number of banks stepping in to support their vehicles. **January
> will bring the start of a second wave of liquidity problems for SIVs as
> the vast majority of medium-term funding starts to come due for
> repayment**, according to a report from Dresdner Kleinwort analysts to be
> published on Wednesday. SIVs rely on cheap, short-term debt to fund
> investments in longer-term, higher-yielding securities. **They have been
> hurt as funding has dried up and asset values have declined.** This
> cheap debt has come from both the very short-term commercial paper
> (CP) markets and from the slightly longer maturity medium-term note
> (MTN) markets. CP funding has long dried up and much of what was sold
> has matured . . . **According to the DrK analysts' calculations, two-
> thirds of all MTN funding for SIVs comes due for repayment by the
> end of next September. Almost $40bn is to be repaid from January to
> March alone. This second liquidity squeeze will affect some SIVs
> more than others. Sigma Finance, run by Gordian Knot, accounts for
> 22.5 percent of all outstanding MTNs issued by SIVs. It must repay
> about $22.5bn by the end of September and another $2.5bn in the
> final quarter.**

*See* Paul J. Davis, Second Wave of SIV Liquidity Problems Looms, FT.com (Dec. 17,

2007) (emphasis added).

50.     Thus, clearly, by as early as December 2007, analysts were predicting that Sigma would face a liquidity crisis by at least the end of September 2008.

51.     In a January 25, 2008 report, a Citi analyst echoed the sentiment of Sigma's impending failure. noting that Sigma had not secured the financing it would need to survive:

> [T]he largest unknown factor seems to be Gordian Knot, not only the largest but also the only non-bank sponsored SIV still looking to secure support.  While initially in a better position due to its longer-term debt profile . . . 60% of the total MTNs will mature in 2008, one-third in the first quarter.  Moody's has told us that Gordian Knot seems close to securing funding, but nothing has been confirmed to date.  The worsening climate in markets does not help, we think.

*See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis (Jan. 25, 2008).

52.     Thus, given these reports concerning numerous failures of SIVs and Sigma's inability to secure the financing it would need to survive beyond September 2008, Defendant had clear knowledge and understanding of the dire financial conditions facing Sigma at least by the end of January 2008 (and likely earlier) or should have, had it been managing the cash collateral in accordance with its legally imposed duty of care.

53.     This is especially true where, as Defendant touts:

> Our securities lending process involves a highly analytical, prudent approach toward achieving an attractive level of profitability. Through a combination of research, market information, individual expertise and solid negotiating skills, J.P. Morgan looks to capture the economic value of the securities lent, thus maintaining attractive spreads without having to resort to investing in lower credit quality issuers or taking excessive interest rate risk.

16

*See* http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (accessed on March 25, 2009).

54.    Thus, given the reported financial conditions facing Sigma and Defendant's self-proclaimed "highly analytical, prudent approach," Defendant should have known that (i) the Plan's and Class Members' investments in the Securities Lending Program were imperiled and (ii) it had legal duties to protect those assets, particularly where as here the initial investments were made in minimal risk fixed income investments.

55.    Had Defendant properly discharged its fiduciary duties, it would have incurred a fraction of the loss, or no loss at all, of the amortized price of the Sigma MTNs for all Class Members.

**F.    Negative Predictions for Sigma Continue**

56.    As forecasted in prior months, the circumstances continued to deteriorate for Sigma after January 2008.

57.    In February 2008, a Citi analyst wrote, "Sigma, the largest (non-bank managed) SIV appears to be the only one left yet to secure support. On February 27, 2008, Moody's put Sigma's CP/MTNs on review for downgrade." The report continued, "Moody's decision to finally place its senior debt ratings on Watch Negative has been based on its liquidity situation and current market valuations. The risk has been looming for weeks." *See* Birgit Specht, European Securitized Products Strategy, Citi European Securitized Products Strategy & Analysis, Feb. 29, 2008, at 5 and 6.

58.     Also in February 2008, the Financial Times reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles. The lack of a large bank behind Sigma leaves it vulnerable to collapse." *See* Paul J. Davis, Moody's to review Sigma rating, FT.com, Feb. 27, 2008.

59.     By at least March 19, 2008, as Bloomberg later reported, Sigma acknowledged that its ability to sell commercial paper had "diminished significantly."

60.     Days later, S&P issued a warning that Sigma's senior debt would be downgraded.   In a March 28, 2008 report, commenting on this development, a Citi analyst expressed further concern over Sigma's viability.   The analyst noted that the SIV was using asset sales to cover its maturing short term debt and increasingly resorting to "repo transactions" for financing purposes.  According to the analyst, "Sigma is the only remaining SIV not to have secured support . . . asset prices have continued to decline, and SIVs continue to sell assets to meet maturing liabilities. . . .  The use of repo poses significant risk to other senior creditors . . . In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owned." *See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis, at 6 (Mar. 28, 2008).

61.     Despite this grim outlook for Sigma, Defendant did nothing to safeguard the Plan's and the Class Members' investments.

62.     The news only got worse.  On April 4, 2008, both Moody's and S&P downgraded the MTNs issued by Sigma and held by the CashCo Fund.

63.     On April 8, 2008, Bloomberg News explained that the ratings agencies' downgrades were precipitated by the bleak prospect that Sigma could secure the funding it needed to remain viable:

> Gordian's Sigma Finance Corp. must refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow, according to Moody's Investor Service.  Moody's cut the $40 billion fund's Aaa rating by five levels to A2 last week because of concern about Sigma's ability to weather the credit crunch.  Standard & Poor's downgraded Sigma on Monday to AA- from AAA.  The inability to replace the debt may cause Sigma to dissolve.

> [Sigma] ... has dodged the turmoil by finding financing alternatives after demand for the industry's primary source of cash, commercial paper, dried up.  A failure would signal a credit market freeze that began in July [2007] and led to the collapse of Bear Stearns isn't close to ending ....

See Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, Bloomberg News (Apr. 8, 2008).  The report also noted that by April 2008, money market funds had already reduced their investments in Sigma and rolled new money into more conservative programs.  See id.

64.     As a consequence of the downgrades, the CashCo Fund's unrealized losses on SFI MTNs increased substantially from its unrealized losses as of January 2008.

65.     As Bloomberg reported, Sigma turned to $26 billion in repo financing to temporarily survive and sold assets to repay maturing debt, shrinking the $40 billion from a peak of $57 billion.  The report cautioned, however, that while the repo arrangements "may" provide financing through June, some of the transactions had not yet been

19

completed. *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, Bloomberg News (Apr. 8, 2008).

66.    Through the summer of 2007, within the analyst community and in the press, the cacophony of alarms continued about the financial troubles facing Sigma.

67.    In July 2008, the Citi analyst that had been following Sigma echoed his warnings about Sigma's use of repo financing and asset sales to make up for shortfalls in financing. He noted, "Sigma's repo funding looks to be the greatest threat to senior creditors – and other investors in AAA ABS and bank floaters. If Sigma were to enter into enforcement/default on its debt, the repo counterparties would effectively rank ahead of senior noteholders. Banks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." *See* Birgit Specht, An Update on SIVs, European Fixed Income Strategy and Analysis, (Jul. 1 2008). As with the prior negative news, Defendant ignored this information. Only a couple months later, the Citi analyst's warnings materialized.

## G.    Analysts' Predictions Come True

68.    As predicted as early as the fall of 2007, Sigma failed.

69.    On September 29, 2008, JP Morgan, one of Sigma's repo counterparties, terminated its repurchase agreement and served Sigma with a notice of default when Sigma could not provide sufficient collateral to JP Morgan in response to a margin call (prompted by a decline in value of the securities JP Morgan held as collateral).

70.     Following JP Morgan, HSBC Holdings PLC and Royal Bank of Scotland Group PLC also terminated their repurchase agreements.

71.     As a result, these lenders seized the assets they held under the repurchase agreements. The defaults allowed Sigma's repo counterparties to sell the securities they held pursuant to the repo agreements.

72.     On September 30. 2008, Moody's and S&P downgraded Sigma on this news and warned that investors in roughly $6 billion of Sigma's remaining debt (which included the MTNs) may not get their money back.

73.     At the time of this default, of Sigma Finance's approximately $27 billion in face value of assets, approximately $25 billion of which had been seized as repo collateral which left approximately $1.9 billion in face value of unencumbered assets backing approximately $6.2 billion in outstanding senior secured liabilities (primarily MTNs).

74.     On October 1, 2008, Sigma announced that it had ceased trading and expected that a receiver would be appointed.

75.     By October 6, 2008, three receivers were appointed to wind up the affairs of Sigma.

76.     On December 2, 2008, the receivers held an auction sale of Sigma's debt securities and sold those securities for $306 million. The receivers estimated that Sigma's obligations to MTN holders was approximately $6.2 billion and that MTNs maturing after October 23, 2008 will not be satisfied from any such proceeds.

21

77.     Each of the Sigma MTNs held in the CashCo Fund as of September 30, 2008 matured after October 23, 2008 and will not participate in any of such proceeds.

78.     Defendant has segregated the Sigma MTNs within the CashCo account. As of December 2008, these securities have lost approximately 97% of their value.

79.     Defendant has made no effort to remedy the losses for which it is liable for under the Securities Agreements and by virtue of its breaches of its fiduciary, common law and contractual duties.

H.     **JP Morgan Propped Up SFI Through Repo Transactions Long Enough For Sigma MTNs It Held In Its Money Market Mutual Funds to Mature Then Pulled The Plug on Sigma**

80.     JP Morgan's involvement with Sigma MTNs was not limited to its investments on behalf of participants in its Securities Lending Program.  At the same time JP Morgan was investing the Plan's and Class Members' money in Sigma MTNs, JP Morgan also provided Sigma with short term repurchase (repo) financing which was necessary to Sigma's survival.  Sigma's repo funding came with significant terms whereby lenders, such as JP Morgan, were able to demand approximately $2 in collateral for every $1 in financing they provided.[3]

81.     Despite the repeated warnings regarding Sigma MTN's and Sigma's survival throughout 2007, as set forth above, JP Morgan continued to invest the Plan's assets in Sigma MTNs.  Simultaneously, JP Morgan earned fees and interest through its

---

[3] Published reports have disclosed that at some point prior to Sigma's collapse, Sigma had to pledge up to $25 billion worth of collateral in exchange for $17 billion in repo funding. *See* http://remington-work.blogspot.com/2008/10/sigma-collapse-ends-shadow-bank-project.html (accessed March 25, 2009).

repo financing for Sigma. Consequently, JP Morgan's financial interest as Sigma's repo financier was in direct conflict with its fiduciary responsibility to the Plan.

82.    In October 2008, JP Morgan issued a notice of default for the credit it provided to Sigma and moved to seize the collateral provided in exchange for its repo funding. JP Morgan's move was followed by other lenders. The banks' seizure of Sigma's assets forced Sigma's collapse. Thus, at the same time that JP Morgan sought to safeguard its own financial interest by seizing Sigma's collateral – precipitating Sigma's collapse – JP Morgan continued to invest the Plan's assets in Sigma.

## V.    CLASS ALLEGATIONS

83.    On behalf of the Plan, Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1)(A) and, alternatively, 23(b)(3) on behalf of a proposed Class consisting of the following:

> All persons and entities for whom or which Defendant, pursuant to a Securities Lending Agreement, invested cash collateral, either directly or through a collective investment vehicle, in one or more debt securities of Sigma Finance, Inc. and continued to hold those debt securities as of the close of business on September 30, 2008. Excluded from the Class are (i) Defendant; (ii) all officers, directors, principals, and partners of Defendant and of Defendant's parents, subsidiaries, or affiliates, at all relevant times; (iii) members of the immediate family of any of the foregoing excluded parties; (iv) the legal representatives, heirs, successors, and assigns of any of the foregoing excluded parties; (v) any entity in which any of the foregoing excluded parties has or had a controlling interest; and (vi) all plans that are governed by ERISA.

84.    The members of the Class are so numerous that joinder of all members is impracticable.

23

85.    The Plan's claims are typical of the claims of all Class Members, as all Class Members are similarly affected by Defendant's uniform and wrongful conduct and their claims are based on such conduct.

86.    The Plan will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class, complex commercial and securities litigation.

87.    Class certification is warranted because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. This is because, among other reasons: (i) Defendant entered into substantially similar Securities Lending Agreements with each member of the Class; (ii) Defendant owed the same duties of care to each member of the Class; and (iii) Defendant made similar investments of the Class Members' cash collateral either directly or through comingled funds.

88.    Alternatively, certification is appropriate under Rule 23(b)(3) because common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action. Among the questions of law and fact common to the Class are:

24

(a)    whether Defendant owed a fiduciary duty to the Plan and members of the Class;

(b)    whether Defendant breached its fiduciary duty by failing to act prudently and solely in the interests of the Plan and members of the Class;

(c)    whether Defendant acted negligently by investing in the Sigma MTNs and/or maintaining its investment of the cash collateral in the Sigma MTNs;

(c)    whether Defendant breached the Securities Lending Agreements by investing in the Sigma MTNs and/or maintaining its investment of the cash collateral in the Sigma MTNs;

(d)    when Defendant knew or should have known of the negative reports and analyst warnings over Sigma; and

(e)    to what extent the Plan and other Class Members have sustained damages and what is the proper measure of damages.

## VI.    CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty – Failure to Prudently and Loyally Manage Plan Assets

89.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

90.    Defendant owed fiduciary duties to the Plan and all other Class Members by virtue of the nature of its relationship with the Plan and the other Class Members

25

and/or by its authority and control over the cash collateral generated by the Securities Lending Program.

91.    These fiduciary duties required Defendant to discharge its obligations with respect to the Plaintiff and all Class Members (a) solely in the interest of the Plan and Class Members, (b) for the exclusive purpose of providing benefits to the Plan and Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the documents and governing instruments.

92.    As a fiduciary, Defendant was not only obligated to ensure that all investments of the cash collateral were initially consistent with the conservative investment guidelines established for the investment of cash collateral, including the diversification requirements, but it was also required to continuously monitor all such investments to ensure that such investments remained prudent throughout the period of the investment.

93.    Thus, if an investment became imprudent due to its excessive risk and/or the inadequate level of diversification within the portfolio or for any other reason, Defendant was obligated to take action to protect the assets of the Plan and other Class Members.

94.    Defendant breached its duties to prudently and loyally manage the assets of the Plan and other Class Members.  As described herein, Defendant knew or should

26

have known that the substantial investment in Sigma MTNs was not a proper investment of the assets of the Plan and other Class Members; notwithstanding this, Defendant failed to adequately protect the Plan and other Class Members from the inevitable losses that it knew or should have known would ensue, due to Defendant's imprudent management of the cash collateral.

95.    Defendant breached the fiduciary duties it owed to Plan and other Class Members by, *inter alia*: (a) failing to conduct a complete, thorough, and careful investigation into the Sigma MTNs which, if conducted, would have revealed a substantial and unacceptable risk of under-collateralization that would leave the Plan and all other Class Members exposed to high risk; (b) imprudently investing the collateral received by the Plan and other Class Members in the Sigma MTNs, which were inappropriate and unsuitable investments for investment of the cash collateral; (c) failing to monitor the investments in the Sigma MTNs which, if prudently performed, would have revealed by January 2008 (if not sooner) the excessive risk associated with Sigma's ability to pay the MTNs as they matured; (d) imprudently maintaining the investments in the Sigma MTNs despite the numerous public warnings – as well as all other information it possessed as a result of acting as Sigma's repo financier – concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured; and (e) disloyally placing its own interest above the interests of the Plan and other Class Members by refusing to liquidate the investment in the Sigma MTNs in an effort to increase its

revenues from the Securities Lending Program notwithstanding the ever-increasing risk of principal losses.

96.    Defendant also breached the fiduciary duties it owed to the Plan and other Class Members by, *inter alia*: (a) earning fees and interest through Defendant's repo financing for Sigma, while maintaining its investment of the assets of the Plan and other Class Members in Sigma MTNs, in violation of its duty of loyalty; (b) failing to timely engage independent fiduciaries who could make independent judgments concerning the investment in Sigma MTNs; and (c) by otherwise disloyally placing its own interests above the interests of the Plan and other Class Members.

97.    As a fiduciary, Defendant was obligated to notify the Plan and other Class Members of any conflict of interest, including the extent of Defendant's self-interest in propping up Sigma through repo financing, seizing Sigma's collateral so as to safeguard it own financial interest, and then pulling the plug on Sigma once that collateral declined in value and Sigma could not meet a margin call.   Notwithstanding its clear duty, Defendant failed to so notify the Plan and other Class Members.

98.    Defendant's breach of its fiduciary duties was the direct and proximate cause of damages to the Plan and all Class Members.

99.    Accordingly, the Plan seeks appropriate relief, as described below, on its own behalf and on behalf of all other Class Members.

28

## COUNT II
### Negligence

100.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

101.    In addition to its fiduciary duties, Defendant owed a duty to the Plan and the other Class Members to exercise reasonable care with respect to its investment of the cash collateral.

102.    Under this standard of care, Defendant was obligated to ensure that all investments of cash collateral were initially consistent with the conservative investment guidelines Defendant understood and agreed applied, and was also required to continuously monitor all such investments to ensure that they remained prudent throughout the period of the investment.

103.    If an investment became imprudent due to its excessive risk and/or the inadequate level of diversification within the portfolio or for any other reason, Defendant was obligated to take action to protect the assets of the Plan and other Class Members.

104.    Defendant breached this duty owed to Plaintiff and all other Class Members by, *inter alia*: (a) failing to conduct a complete, thorough, and careful investigation into the Sigma MTNs which, if conducted, would have revealed a substantial and unacceptable risk of under-collateralization which would leave the Plan and all other Class Members exposed to high risk; (b) imprudently investing the collateral received by Plaintiff and other Class Members in the Sigma MTNs, which were inappropriate and unsuitable investments for investment of the cash collateral; (c) failing

29

to monitor the investments in the Sigma MTNs which, if prudently performed, would have revealed by January 2008 (if not sooner) the excessive risks associated with Sigma's ability to pay the MTNs as they matured; (d) imprudently maintaining the investments in the Sigma MTNs despite the numerous public warnings – as well as all other information it possessed as a result of acting as Sigma's repo financier – concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured; and (e) disloyally placing its own interest above the interests of the Plan and other Class Members by refusing to liquidate the investment in the Sigma MTNs notwithstanding the ever-increasing risk of principal losses.

105.    The Plan and the other Class Members suffered damages as a result of Defendant's failure to exercise reasonable care with respect to its investment of cash collateral.

106.    Defendant's breach of this duty was the direct and proximate cause of injury and damages to the Plan and all Class Members.

107.    Accordingly, the Plan seeks appropriate relief, as described below, on its own behalf and on behalf of all Class Members.

## COUNT III
## Breach of Contract

108.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

109.     During the relevant times to the allegations made herein, Defendant was a party to a valid and existing Securities Lending Agreement with each Class Member, including the Plan.

110.     The Securities Lending Agreements required Defendant, *inter alia*: (a) to comply with the Investment Guidelines (including safeguarding principal and maintaining adequate liquidity); (b) to discharge its fiduciary duties to the Plan and all other Class Members; and (c) to assume liability for any losses resulting from its negligence, bad faith or willful misconduct in managing the Securities Lending Program.

111.     Defendant breached these contractual obligations by: (a) failing to conduct a complete, thorough, and careful investigation into the Sigma MTNs which, if conducted, would have revealed a substantial and unacceptable risk of under-collateralization which would leave the Plan and all other Class Members exposed to high risk; (b) imprudently investing the collateral received by Plaintiff and other Class Members in the Sigma MTNs, which were inappropriate and unsuitable investments for investment of the cash collateral and which did not comply with the Investment Guidelines; (c) failing to monitor the investments in the Sigma MTNs which, if prudently performed, would have revealed by January 2008 (if not sooner) the excessive risks associated with Sigma's ability to pay the MTNs as they matured; and (d) imprudently maintaining the investments in the Sigma MTNs despite the numerous public warnings – as well as all other information it possessed as a result of acting as Sigma's repo financier

31

– concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured.

112.    Defendant was also required to comply with the duty of good faith and fair dealing that is implied by law into all contracts.

113.    Under this standard of care, Defendant was required to deal honestly with the Plan and other Class Members regarding the nature of losses suffered, the reason for the losses, the increasing risk of loss faced by the Plan and other Class Members as a consequence of Sigma's deteriorating financial condition. The implied duty of good faith and fair dealing also prohibited Defendant from subordinating the interests of the Plan and other Class Members for Defendant's personal gain.

114.    Defendant breached the duty of good faith and fair dealing by, *inter alia*: (a) securing a senior security interest in the same collateral that secured the investments of the Plan and other Class Members in Sigma; (b) failing to inform the Plan and other Class Members that it had secured a senior interest in the very same collateral that secured their investments in Sigma; (c) terminating the repo funding agreement with Sigma and causing Sigma to default on the MTNs without advising the Plan and other Class Members of the consequences of this action; and (d) concealing from the Plan and other Class Members Defendant's own role in Sigma's collapse and the resultant losses to the Plan and other Class Members.

115.    The Plan and all other Class Members sustained actual damages as a direct and proximate result of breaches described above.

116.    Accordingly, the Plan seeks appropriate relief, as described below, on its own behalf and on behalf of all Class Members.

## VII.    JURY DEMAND

117.    Plaintiff demands a trial by jury as to all issues so triable.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that Defendant has breached its fiduciary, common law and contractual duties to the Plan and other Class Members;

B.    An Order compelling Defendant to make good to the Plan and all Class Members all losses resulting from Defendant's breaches of their fiduciary, common law and contractual duties, including losses resulting from Defendant's imprudent investment of the cash collateral, and to restore to the Plan and other Class Members all profits Defendant made through use of the cash collateral, and to restore to the Plan and other Class Members all profits that they would have made if the Defendant had fulfilled its legal obligations;

C.    Imposition of a constructive trust on any amount by which Defendant was unjustly enriched at the expense of the Plan and other Class Members;

D.    Actual damages in the amount of any losses suffered by the Plan and other Class Members;

E.    An Order awarding pre-judgment and post-judgment interest at the maximum allowable rates, along with an award of attorneys' fees and costs; and

33

F.     An Order awarding such other and further relief as the Court deems just and proper.


Dated: March 27, 2009.                          Respectfully submitted,

                                        **DEALY & SILBERSTEIN, LLP**

                                        Milo Silberstein (MS 4637)
                                        225 Broadway, Suite 1405
                                        New York, NY 10007
                                        Telephone: (212) 385-0066
                                        Facsimile:  (212) 385-2117

                                        **BARROWAY TOPAZ KESSLER**
                                        **MELTZER & CHECK, LLP**
                                        Joseph H. Meltzer
                                        Darren Check
                                        Peter H. LeVan, Jr.
                                        Sharan Nirmul
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Telephone:  (610) 667-7706
                                        Facsimile: (610) 667-7056

                                        **NIX PATTERSON & ROACH, LLP**
                                        Bradley E. Beckworth
                                        Brad E. Seidel
                                        205 Linda Drive
                                        Daingerfield, Texas 75638
                                        Telephone: (903) 645-7333
                                        Facsimile: (903) 645-4415

                                        *Attorneys for Plaintiff and Proposed Class*

## <u>EXHIBIT A</u>

## AMENDMENT TO SECURITIES LENDING AGREEMENT

AMENDMENT ("Amendment"), dated as of August    , 2002, to the Securities Lending Agreement ("Lending Agreement"), dated as of June 19, 2002, between Imperial County Employees' Retirement System and JPMorgan Chase Bank.

It is hereby agreed as follows:

1. The Lending Agreement is hereby amended by adding the following new sentence at the end of Section 1(c) thereof:

The foregoing investments shall be made through the 'JPMorgan Chase Bank Cash Collateral Fund', a collective investment fund managed by Bank.

2. The Lending Agreement is hereby further amended by added the following at the end of the second sentence of Section 5(b) thereof:

; it being understood and agreed, however, that the JPMorgan Chase Bank Cash Collateral Fund shall consist solely of assets of tax exempt defined benefit and defined contribution retirement plans of: (a) entities governed by ERISA and (b) public entities

3. Existing Appendix 1 to the Lending Agreement is hereby deleted and the version of Appendix 1 annexed hereto and captioned "JPMorgan Chase Bank Cash Collateral Fund" is substituted in lieu thereof.

4. Except as expressly amended by this Amendment, the Lending Agreement shall remain in full force and effect in accordance with its terms. All references to the Agreement in the Lending Agreement or any other document executed or delivered in connection therewith shall, from and after the effective date of this Amendment, be deemed to be references to the Lending Agreement, as amended hereby, unless the context expressly requires otherwise.

5. This Amendment may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

6. This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws thereunder.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above-written.

IMPERIAL COUNTY EMPLOYEES'             JPMORGAN CHASE BANK
  RETIREMENT SYSTEM

By:                                    By:
Name:    DAVID H. PRINCE               Name:   GENE GEMELLI
Title:   CHAIRMAN                      Title:  VICE PRESIDENT
Date:    AUGUST 22, 2002

**RECEIVED**

AUG 2 7 2002

IMPERIAL COUNTY
EMPLOYEES RETIREMENT
SYSTEMS

274776:v03

SECURITIES LENDING

**JPMORGAN CHASE BANK CASH COLLATERAL FUND (VAN 18)**

**INVESTMENT GUIDELINES**

**A.    FUND OBJECTIVE**

This short term, fixed income fund (the "Fund") is designed to obtain an attractive yield on securities lending cash collateral by investing in eligible securities that satisfy these guidelines, as applied at the time of purchase.

**B.    PERMISSIBLE INVESTMENTS**

**1.    Instruments:**

The Fund is permitted to purchase fixed-income instruments and other securities with debt-like characteristics, including (subject to the Prohibited Investments set forth in paragraph C):

Asset Backed Securities
Bank Notes
Banker's Acceptances
Certificates of Deposit
Commercial Paper,
   including unregistered
   (so-called 4(2))
   Commercial Paper
Corporate Bonds
Corporate Notes
Floating Rate Notes
Floating Rate
   Certificates of Deposit
GICs and synthetic GICs

Master Notes
Medium Term Notes
Promissory Notes
Repurchase Agreements
Time Deposits
U.S. Government Securities
   including Obligations of
   the U.S. Treasury and
   Obligations of U.S.
   Government Agencies or
   Instrumentalities

**2.    Commingled Vehicles:**

In addition, for purposes of these guidelines, shares of a money market mutual fund (a "money market fund") registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"): (i) shall be an Eligible Security, (ii) shall be deemed to have a Final Maturity of one day for purposes of the Maturity

**Appendix 2**
# JPMorgan Chase Bank
## Securities Lending
## Approved Borrowers

### U.K. approved Borrowers that have signed an OSLA

Barclays Capital Securities Limited
Bear Stearns International Limited
BNP Paribas
Cater Allen International Limited
CIBC World Markets PLC
JPMorgan Europe Limited
Commerzbank AG
Credit Suisse First Boston (Europe) Limited
Daiwa Securities SMBC Europe Limited
Deutsche Bank AG
GNI Ltd
Goldman Sachs International
ING Baring Limited
JP Morgan Securities Limited
Lehman Brothers International (Europe)
Maple Securities (UK) Limited
Merrill Lynch International
Morgan Stanley & Co. International Limited
Nomura International PLC
SG Securities (London) Limited
Salomon Brothers International Limited
UBS AG London Branch


### U.K. approved Borrowers that have signed a GESLA

Barclays Bank Plc
Cater Allen International Limited
Credit Suisse First Boston (Europe) Limited
Deutsche Bank AG London Branch
Dresdner Bank AG London Branch
GNI Limited
Goldman Sachs International Limited
Halifax Plc
Investec Bank UK Limited
JPMorgan Securities Limited
Lazard Bank Limited
Lehman Brothers International (Europe)
Morgan Stanley & Co. International Limited
Merrill Lynch international
Salomon Brothers International Limited
UBS AG London Branch

**Appendix 2**
# JPMorgan Chase Bank
## Securities Lending
## Approved Borrowers

**U.K. approved Borrowers that have signed a MEFISLA**                    pg 3 of 3

Cater Allen International Limited
Bear Stearns International Trading Limited
GNI Limited
Commerzbank AG
Credit Suisse First Boston Equities Limited
Goldman Sachs International
Morgan Grenfell & Co Limited
Nomura International Plc
Investec Bank (UK) Limited
JP Morgan Securities Limited
Lazard Bank Limited
Lehman Brothers International (Europe)
Merrill Lynch International Limited
Morgan Stanley Securities Limited
Nomura International Plc
Salomon Brothers UK Equity Limited
UBS AG London Branch

### Australian approved Borrowers that have signed a ASLA

1.  J.P. Morgan Australia Limited
2.  CSFB Australia Ltd.
3.  Macquarie Bank Limited
4.  Merrill Lynch Equities (Australia) Ltd.
5.  National Australia Bank
6.  J.P. Morgan Australia Securities Limited
7.  Paloma Securities LLC/SEB AB
8.  Salomon Smith Barney Australia Securities Pty Limited
9.  UBS Warburg Australia Equities Ltd.
10. UBS Warburg Australia Ltd.

### Japanese approved Borrowers that have signed a JSDA

1.  BNP Paribas Securities (Japan) Limited
2.  Credit Suisse First Boston (Japan) Limited

February 5, 2002

**Appendix 3**
**(formerly Appendix 5)**
**JPMorgan Chase Bank**
**Securities Lending**
**ACCEPTABLE COLLATERAL**


1)          CASH

2)          SECURITIES

3)          LETTERS OF CREDIT

**Appendix 4**
**(formerly Appendix 2)**
**JPMorgan Chase Bank**
**Securities Lending**
**LETTER OF CREDIT BANKS**

ABN AMRO Bank
Banco Santander Central Hispano S.A.
Bank of America NA
Bank of Montreal
Bank of New York
Bank One NA - Chicago
Bankers Trust Co.
Barclay's Bank PLC
BNP Paribas
Canadian Imperial Bank of Commerce
Citibank, NA
Credit Suisse First Boston
Den Danske Bank A/S
Deutsche Bank AG
Fleet National Bank
Fortis Bank NV SA
HSBC Bank PLC
HSBC Bank USA
Lloyds TSB Bank PLC
Mellon Bank N.A.
Morgan Guaranty Trust Co. of NY
National Westminister Bank PLC
PNC Bank N.A.
Rabobank Nederland
Royal Bank of Canada
Royal Bank of Scotland PLC
Societe Generale
Svenska Handelsbanken
Toronto-Dominion Bank
UBS AG

02/12/02

Run Date: 2/10/2009    SLAM CLIENT HOLDINGS MARK-TO-MARKET REPORT    AS OF DATE:    2/6/2009    Page    1

**Client:** CASHCO    JPMORGAN CHASE BK CASH COL

**Currency:** USD

**FIXED**

| Issuer Name | Product | Cusip | Settle Dt | Final Maturity Dt | Par Amount | Purchase Price | Market Price | Principal Amount | Market Value | Amortized Cost | Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BNP PARIBAS SECURITIES CORP. | BPTN | | 2/6/2009 | 2/9/2009 | 201,471,467.26 | 100.000000 | 100.000000 | 201,471,467.26 | 201,471,467.26 | 201,471,467.00 | 0.26 |
| CDC FINANCIAL PRODUCTS INC | RPAB | | 2/6/2009 | 2/5/2009 | 175,000,000.00 | 100.000000 | 100.000000 | 175,000,000.00 | 175,000,000.00 | 175,000,000.00 | 0.00 |
| CDC FINANCIAL PRODUCTS INC | RPAAA | | 2/6/2009 | 3/6/2009 | 50,000,000.00 | 100.000000 | 100.000000 | 50,000,000.00 | 50,000,000.00 | 50,000,000.00 | 0.00 |
| BARCLAYS CAPITAL | RPAAA | | 2/6/2009 | 2/9/2009 | 125,000,000.00 | 100.000000 | 100.000000 | 125,000,000.00 | 125,000,000.00 | 125,000,000.00 | 0.00 |
| LANDESBANK BADEN WUERTTEMBERG LCCPX | | | 1/7/2009 | 2/9/2009 | 100,000,000.00 | 100.000916 | 100.000000 | 100,000,916.00 | 100,000,000.00 | 100,000,000.00 | 0.00 |
| CREDIT INDUSTRIAL ET COMM. LONDON | ECCPX | | 1/7/2009 | 2/9/2009 | 100,000,000.00 | 100.000000 | 100.000000 | 100,000,000.00 | 100,000,000.00 | 100,000,000.00 | 0.00 |
| AMSTEL FUNDING CORP | CPAB | 03216RPD6 | 1/14/2009 | 2/13/2009 | 25,000,000.00 | 99.987940 | 99.999033 | 24,972,916.67 | 24,996,975.50 | 24,996,389.00 | 586.00 |
| KBC, BRUSSELS | TD | | 1/14/2009 | 2/17/2009 | 50,000,000.00 | 100.000000 | 100.003333 | 50,000,000.00 | 50,001,666.67 | 50,000,000.00 | 1,666.67 |
| MONTE DE PASCHI N.Y. | YKFX | 099402NKC3 | 1/14/2009 | 2/17/2009 | 75,003,811.25 | 100.003725 | 100.000000 | 75,003,811.25 | 75,002,731.25 | 75,003,197.00 | -465.75 |
| ROYAL BANK OF SCOTLAND NEW YORK | YKFX | 78010QPP7 | 2/20/2008 | 2/20/2009 | 67,811,000.00 | 100.000606 | 100.094100 | 67,811,000.00 | 67,876,369.00 | 67,811,000.00 | 65,369.00 |
| SAN PAOLO IMI IRELAND | ECTY2C | | 8/21/2008 | 2/23/2009 | 47,811,000.00 | 98.188559 | 99.982500 | 66,718,265.95 | 67,799,133.00 | 67,728,751.00 | 70,382.00 |
| RAIFFEISEN ZENTRALBANK OEST VIENNATD | | | 12/22/2009 | 2/27/2009 | 75,000,000.00 | 100.000000 | 100.023500 | 75,000,000.00 | 75,021,125.00 | 75,000,000.00 | 70,625.00 |
| RHEINGOLD SECURITIZATION | CPAB | 76260LPT7 | 1/30/2009 | 2/27/2009 | 26,540,000.00 | 99.559200 | 99.553333 | 26,423,189.04 | 26,329,171.04 | 26,332,038.00 | -2,866.32 |
| BLB GRAND CAYMAN | TD | 3/2/2009 | 3/27/2009 | 50,000,000.00 | 100.000000 | 99.994167 | 50,000,000.00 | 49,997,083.34 | 50,000,000.00 | -2,916.67 |
| SURREY FUNDING CORP | CPAB | 86888LVQ16 | 1/29/2009 | 3/2/2009 | 50,000,000.00 | 99.951117 | 99.954300 | 49,975,615.56 | 49,977,100.00 | 49,983,358.00 | -6,258.00 |
| ASPEN FUNDING CORP | CPAB | 04327TQ37 | 1/29/2009 | 3/2/2009 | 80,000,000.00 | 99.950600 | 99.959000 | 79,952,323.33 | 79,840,648.00 | 79,848,322.00 | -7,581.00 |
| | | | **Total FIXED** | | 1,318,658,278.51 | | | 1,317,464,722.65 | 1,318,633,083.07 | 1,318,495,322.01 | 137,741.07 |

**FLOATING**

Run Date: 2/11/2009   SLAM CLIENT HOLDINGS MARK-TO-MARKET REPORT   AS OF DATE: 2/16/2009   Page 2

| Issuer Name | Product | Cusip | Settle Dt | Final Maturity Dt | Purchase Price | Par Amount | Market Price | Principal Amount | Market Value | Amortized Cost | Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TRANSAMERICA OCCIDENTAL LIFE INS CPA | 1AHFL | 89351 29C9 | 2/25/2005 | 2/13/2009 | 100.000000 | 14,919,000.00 | 100.128029 | 14,919,000.00 | 14,919,000.00 | 14,919,000.00 | 0.00 |
| TRANSAMERICA OCCIDENTAL LIFE INS CPA | 1AHFL | 89351 29C9 | 2/25/2005 | 2/13/2009 | 100.000000 | 67,811,000.00 | 100.128029 | 67,811,000.00 | 67,811,000.00 | 67,811,000.00 | 0.00 |
| CDC FINANCIAL PROD INC | 1AHFL | 89999342110 | 11/22/2006 | 2/13/2009 | 100.000000 | 65,000,000.00 | 100.000001 | 65,000,000.00 | 65,000,000.00 | 65,000,000.00 | 0.00 |
| BETA FINANCE INC | 1ATNFL | 01658AAK1 | 2/26/2007 | 2/17/2009 | 99.234780 | 7,799,000.00 | 90.891708 | 7,398,298.07 | 7,790,555.68 | 7,790,939.00 | -4,383.32 |
| GENWORTH LIFE INSURANCE CO | FA | 36199AEC2 | 2/19/2004 | 2/19/2009 | 100.000000 | 16,953,000.00 | 100.000000 | 16,953,000.00 | 16,953,000.00 | 16,953,000.00 | 0.00 |
| BANK IRELAND ST(AMFORD) | Y/KFL | 38379WXS4 | 12/24/2008 | 2/20/2009 | 100.000000 | 67,811,000.00 | 99.993600 | 67,811,000.00 | 67,806,660.39 | 67,811,000.00 | -4,339.90 |
| BBVA SR FIN SA | MTNFL | 05459PAF8 | 3/13/2007 | 3/12/2009 | 100.000000 | 8,136,000.00 | 99.871500 | 8,136,000.00 | 8,127,542.67 | 8,138,000.00 | -10,457.33 |
| BEAR STEARNS | MTNFL | 07923FV42 | 3/24/2007 | 3/23/2009 | 100.000000 | 84,764,000.00 | 99.807600 | 84,764,000.00 | 84,600,914.06 | 84,764,000.00 | -163,085.94 |
| BEAR STEARNS | MTNFL | 07923FV42 | 3/24/2007 | 3/23/2009 | 100.000000 | 5,764,000.00 | 99.807600 | 5,764,000.00 | 5,752,910.06 | 5,764,000.00 | -11,089.94 |
| BEAR STEARNS | MTNFL | 07923FV42 | 3/23/2007 | 3/23/2009 | 100.000000 | 5,764,000.00 | 99.807600 | 5,764,000.00 | 5,752,910.06 | 5,764,000.00 | -11,089.94 |
| NEW YORK LIFE CIL FUNDING | MTNFL | 64954AE27 | 9/26/2005 | 3/18/2009 | 100.000000 | 33,907,000.00 | 99.602556 | 33,907,000.00 | 33,772,238.51 | 33,907,000.00 | -134,761.49 |
| CHARTER ONE BK NA | BNFL | 16132NAX4 | 5/2/2007 | 4/24/2009 | 100.094180 | 7,078,000.00 | 99.316000 | 7,070,000.76 | 7,021,641.20 | 7,070,841.00 | -49,039.80 |
| BETA FINANCE INC | MTNFL | 08658AAL3 | 5/18/1877 | 5/6/2009 | 95.932660 | 54,249,000.00 | 98.455900 | 54,242,694.11 | 53,110,070.22 | 54,245,920.00 | -835,869.79 |
| CC USA INC | MTNFL | 12560GTW9 | 3/14/2007 | 5/14/2009 | 99.932280 | 27,125,000.00 | 98.344200 | 27,121,799.63 | 26,976,976.38 | 27,123,333.00 | -144,356.62 |
| TANGO FINANCE CORP | MTNFL | 87583THZ1 | 6/29/2007 | 6/29/2009 | 99.923590 | 27,115,000.00 | 99.519800 | 27,120,157.78 | 26,994,574.73 | 27,121,234.00 | -126,705.15 |
| PHOENA GLOBAL FUNDING I | MTNFL | 74151AV9 | 12/8/2006 | 7/15/2009 | 100.000000 | 13,563,000.00 | 99.612900 | 13,562,000.00 | 13,509,501.50 | 13,562,604.00 | -52,498.50 |
| BEAR STEARNS | MTNFL | 07993RW32 | 7/10/2007 | 7/16/2009 | 100.000000 | 67,811,000.00 | 99.557200 | 67,811,000.00 | 67,510,808.70 | 67,811,000.00 | -309,199.30 |
| CATERPILLAR FINANCIAL SERVICES CORP/NFNL | MTNFL | 14912LJ48 | 5/4/2007 | 7/27/2009 | 100.115600 | 16,953,000.00 | 98.779400 | 16,952,000.00 | 16,743,543.21 | 16,956,933.00 | -212,474.79 |
| CATERPILLAR FINANCIAL SERVICES CORP/NFNL | MTNFL | 14912LJ48 | 5/4/2007 | 7/27/2009 | 100.114300 | 16,953,000.00 | 98.778400 | 16,952,000.00 | 16,743,548.21 | 16,956,019.00 | -212,460.79 |
| BARCLAYS NEW YORK | Y/KFL | 06738JCC3 | 8/26/2004 | 8/26/2009 | 99.175600 | 16,993,000.00 | 99.036200 | 16,993,000.00 | 16,863,103.71 | 16,953,600.00 | -88,496.29 |
| ROYAL BANK OF CANADA NY | Y/KFL | 78009JLA1 | 9/10/2008 | 10/1/2009 | 100.025800 | 16,993,000.00 | 100.025800 | 16,993,000.00 | 16,956,373.62 | 16,953,000.00 | 4,773.62 |
| **Total FLOATING** | | | | | | 645,379,000.00 | | 643,344,549.14 | 640,715,810.64 | 649,379,139.00 | -2,663,328.34 |

Run Date:  2/10/2009          SLAM CLIENT HOLDINGS MARK-TO-MARKET REPORT          AS OF DATE:  2/6/2009          Page  3

| Issue Name | Product | Cusip | Settle Dt | Final Maturity Dt | Par Amount | Purchase Price | Market Price | Principal Amount | Market Value | Amortized Cost | Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total | USD | 1,962,015,394.51 | | | 1,960,880,481.19 | 1,959,349,873.71 | 1,961,874,461.00 | -2,524,587.29 |
| | | | | | | | | | NAV: | 0.99971169 | |

Note: Market value information (including without limitation, prices and accrued income) furnished in this report has been obtained by sources which JPMorgan believes to be reliable and is furnished for exclusive use of customer to whom this statement is addressed.  JPMorgan MAKES NO STATEMENT OR WARRANTY, EXPRESSED OR IMPLIED, THAT ANY QUOTED VALUES necessarily reflect the proceeds which may be received on the sale of a security.