UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/15/11

BOARD OF TRUSTEES OF THE AFTRA
RETIREMENT FUND, in its capacity as a
fiduciary of the AFTRA Retirement Fund,
individually and on behalf of all others
similarly situated,

          Plaintiff,

    - against -

JPMORGAN CHASE BANK, N.A.,

          Defendant.

-------------------------------------------------- X

BOARD OF TRUSTEES OF THE
IMPERIAL COUNTY EMPLOYEES'
RETIREMENT SYSTEM, in its capacity
as a fiduciary of the Imperial County
Employees' Retirement System,
individually and on behalf of all others
similarly situated,

          Plaintiff,

    - against -

JPMORGAN CHASE BANK, N.A.,

          Defendant.

-------------------------------------------------- X

**OPINION AND ORDER**

09 Civ. 686 (SAS)

09 Civ. 3020 (SAS)

THE INVESTMENT COMMITTEE OF
THE MANHATTAN AND BRONX
SURFACE TRANSIT OPERATING
AUTHORITY PENSION PLAN, in its
capacity as a fiduciary of the MaBSTOA
Pension Plan, individually and on behalf of
all others similarly situated,

                     **09 Civ. 4408 (SAS)**

                     **Plaintiff,**

              **- against -**

**JPMORGAN CHASE BANK, N.A.**,

                    **Defendant.**

----------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        This class action arises out of JPMorgan Chase Bank, N.A.'s

("JPMC's") investment of certain "securities lending" clients' cash collateral in the

June 2009 Medium-Term Notes (the "MTNs") of Sigma Finance, Inc. ("Sigma"), a

structured investment vehicle ("SIV") that collapsed on September 30, 2008.[1]

---

[1]     I granted plaintiffs' motion for class certification on August 4, 2010.
*See Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank,
N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010). I granted JPMC's motion for partial
summary judgment and denied plaintiffs' motion for partial summary judgment on
August 5, 2011. *See Board of Trustees of the AFTRA Retirement Fund v.*

Class members governed by the Employee Retirement Income Security Act ("ERISA") assert claims for breach of the fiduciary duty to prudently manage plan assets. Class members not governed by ERISA assert analogous prudence claims under New York common law, in addition to breach of their securities lending agreements with JPMC.

Both JPMC and plaintiffs now cross-move pursuant to Rules 702 and 403 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[2] and its progeny to exclude expert testimony proffered by their adversary. For the reasons discussed below, JPMC's motion is granted in part and denied in part, and plaintiffs' motion is denied.

## II.    BACKGROUND

### A.    Plaintiffs' Experts

#### 1.    Professor Bernard Black

Professor Bernard Black is currently the Nicholas D. Chabraja Professor at Northwestern University, with positions as Professor of Law in the School of Law, Professor of Finance in the Kellogg School of Management, and

---

*JPMorgan Chase Bank, N.A.*, — F. Supp. 2d —, Nos. 09 Civ. 686, 09 Civ. 3020, 09 Civ. 4408, 2011 WL 3477219 (S.D.N.Y. Aug. 5, 2011). This Opinion assumes familiarity with the background and applicable law of this case, as stated in the prior opinions.

[2]    509 U.S. 579 (1993).

Faculty Associate at the Institute for Policy Research.[3]  He holds undergraduate

and graduate degrees in physics from Princeton University and the University of

California at Berkeley, respectively, and a law degree from Stanford Law School.[4]

Professor Black has written expert reports and presented expert testimony in a wide

range of matters on topics concerning corporate finance and corporate governance.[5]

Professor Black offers an opinion that the Securities Lending unit of

JPMC ("JPM Securities Lending"), as a fiduciary to pension plan plaintiffs, failed

to meet the ERISA "prudent expert" standard of care because it

> (1) failed to establish an appropriate position limit on investments
> in Sigma; (2) failed to understand the risks associated with
> Sigma's business model; (3) failed to conduct sufficient due
> diligence on its investments in Sigma; (4) failed to understand
> how repo financing affected Sigma's viability; (5) failed to assess
> the likelihood that Sigma could survive long enough to repay its
> June 2009 medium term notes (MTNs); (6) failed to follow up on
> "red flags" that provided warnings of trouble ahead; (7) failed to
> consider a full range of exit strategies; (8) failed to disclose
> sufficient information about its Sigma investment to its
> beneficiaries; and (9) allowed critical decisions to be taken by
> people without sufficient knowledge or finance training to

---

[3]    *See* 8/10 Curriculum Vitae of Bernard S. Black ("Black CV"), App. A
to 8/13/10 Expert Report of Bernard S. Black ("Black Report"), Ex. A to 9/12/11
Declaration of Samuel E. Bonderoff, counsel for JPMC ("Bonderoff Decl."), at 1.

[4]    *See id.* at 18.

[5]    *See* List of Expert Reports, Depositions and Trial or Arbitration
Testimony of Bernard Black, App. B to Black Report.

properly assess the risks of continuing to hold Sigma MTNs.[6]
Moreover, Professor Black offers an opinion that, as Sigma was winding down,
JPM Securities Lending was "gambling on which MTNs would pay off, and doing
so without knowing the odds" while "there was a high likelihood that Sigma would
fall off a 'repo cliff' well before the 2009 MTNs matured."[7]

### 2. Fiachra O'Driscoll

Fiachra O'Driscoll is a partner at KFSO Investments, an investment
business focused on equities trading.[8]  From 1992 to 2008, O'Driscoll worked in
increasingly senior positions at Credit Suisse, most recently as Managing Director,
Co-Head of CDO Structuring, Americas.[9]  In that capacity, O'Driscoll was
responsible for Credit Suisse's restructuring efforts for SIVs beginning in the
spring of 2007.[10]  Before joining Credit Suisse, O'Driscoll received an M.B.A.
from Harvard Business School.  In addition, he holds a bachelor's degree in

---

[6]      Black Report at 3.

[7]      *Id.*

[8]      *See* Resume of Fiachra T. O'Driscoll ("O'Driscoll Resume"), Ex. 1 to
Report of Fiachra T. O'Driscoll Submitted on Behalf of Plaintiffs ("O'Driscoll
Report"), Ex. E to Bonderoff Decl.

[9]      *See id.*

[10]      *See* O'Driscoll Report at 2.

Computer Engineering from Trinity College in Dublin, Ireland.[11]

O'Driscoll offers an opinion that, during the relevant period, JPMC "had ample opportunity to sell the $490 million of Sigma MTNs . . . at the then-existing prices."[12] In addition, O'Driscoll echoes other plaintiffs' experts in stating that JPMC's decision to invest in and hold Sigma MTNs was imprudent.[13]

### 3. Daniel Nigro

Daniel Nigro is currently a consultant with Warfield Consultants, which provides a "Full Range of Fixed Income Intelligence across Sectors."[14] He has worked in fixed income markets as an institutional investor for over twenty-five years, with over twenty of those years spent as a portfolio manager.[15] During that time, Nigro acquired experience analyzing, purchasing, and managing asset-backed securities ("ABS") and mortgage-backed securities ("MBS").[16] Nigro received an M.B.A. in Finance and Marketing and an undergraduate degree in

---

[11]     *See* O'Driscoll Resume.

[12]     O'Driscoll Report at 3.

[13]     *See id.*

[14]     Resume of Daniel Nigro ("Nigro Resume"), App. A to 8/12/10 Declaration of Daniel J. Nigro ("Nigro Decl."), Ex. C to Bonderoff Decl., at 1.

[15]     *See* Nigro Decl. ¶ 1.

[16]     *See id.*

6

Finance from the State University of New York at Buffalo.[17]

Nigro offers an opinion that "the prudence of JPM's decision to buy and hold the 2009 Sigma notes can be determined utilizing the same proof for all Class Members."[18] JPMC "was required to invest in only the highest quality instruments" and JPMC's prudence can be evaluated by looking at "(a) the characteristics and risk attributes of the notes themselves, and (b) the marked conditions at the time of the investment decision."[19] Applying this methodology to the facts at hand, Nigro concludes

> the characteristics and attributes of the 2009 Sigma notes and the prevailing market conditions at the time of the investment decisions render the investment decisions to buy and subsequently hold the 2009 Sigma notes for Class Members imprudent.[20]

**B.      JPMC's Experts**

**1.      Patricia W. Chadwick**

Patricia W. Chadwick is the Founder and President of Ravengate Partners LLC, a consulting firm that provides "businesses and not-for-profit

---

[17]      *See* Nigro Resume at 3.

[18]      Nigro Report ¶ 8.

[19]      *Id.* ¶¶ 9-10.

[20]      *Id.* ¶ 11.

institutions with education and advice about financial markets."[21]  Before

Chadwick's current position, she "served for 26 years in increasingly senior

positions as a securities analyst, portfolio manager, investment strategist, and

director of research/portfolio management/trading and sales at major asset-

management firms."[22]  For eighteen of those years, she served as a portfolio

manager, managing approximately five-billion dollars in assets.[23]  Chadwick has

previously given expert testimony on "investment processes, investment research,

and portfolio management."[24]  Chadwick received an undergraduate degree in

economics from Boston University.[25]

Chadwick offers an opinion that JPMC "acted reasonably and

appropriately when it purchased the Sigma MTNs."[26]  In reaching this conclusion,

---

[21]    Resume of Patricia W. Chadwick ("Chadwick Resume"), App. A to
8/13/10 Expert Report of Patricia W. Chadwick ("Chadwick Report"), Ex. A
9/12/11 Declaration of Peter H. LeVan Jr., plaintiffs' counsel, in Support of
Plaintiffs' Memorandum of Law in Support of Their Motion to Exclude
Defendant's Proposed Expert Opinions of Patricia W. Chadwick and Dr. Michael
F. Koehn ("LeVan Decl.").

[22]    Chadwick Report ¶ 2.

[23]    *See id.*

[24]    *Id.* ¶ 5.

[25]    *See* Chadwick Resume.

[26]    Chadwick Report ¶ 11.

Chadwick considered that (1) Sigma MTNs met or exceeded JPMC's investment guidelines; (2) Sigma MTNs had the highest possible ratings from all three rating agencies; and (3) Sigma had a history of being a credit-worthy issuer with high-quality assets.[27]  Moreover, JPMC had no reason to be concerned about problems in the subprime sector in the first half of 2007 because Sigma MTNs did not have direct exposure to the subprime market.  At the time many believed that "problems in the subprime market would have limited impact on the credit markets and market as a whole."[28]  Chadwick also states that JPMC's decision to hold the notes was reasonable based on the information available at the time, which indicated that any sale would have resulted in a drastic loss.  At the time, it was reasonable to believe that JPMC could receive a greater recovery if Sigma defaulted and entered receivership than if JPMC sold the MTNs into an illiquid and distressed market.[29]  Finally, Chadwick opines that JPMC's credit analysis was "professional, thorough, and consistent."[30]

## 2.    Dr. Michael F. Koehn

---

[27]    *See id.*

[28]    *Id.*

[29]    *See id.*

[30]    *Id.*

Dr. Michael F. Koehn is an economist with a specialization in microeconomics and finance. Dr. Koehn co-founded Analysis Group, Inc. and continues to serve as a consulting affiliate.[31] He has a Ph.D. in Financial Economics from the Wharton School, University of Pennsylvania.[32]

Dr. Koehn critiques plaintiffs' experts for portraying "an overly simplistic picture of this case that demonstrates a misunderstanding of securities lending, ignores the investment guidelines that were in place, and relies on hindsight."[33] According to Dr. Koehn, securities lending requires a certain level of risk, which "was explicitly contemplated and permitted by the investment guidelines that [JPM Securities Lending] negotiated with its clients."[34] He also attacks plaintiffs' experts' reliance on "red flags" because such supposed warning signs were known to the market and reflected in the market price of Sigma MTNs, which did not move materially until the spring of 2008.[35]

## III.   ADMISSION OF EXPERT EVIDENCE

---

[31]    *See* 5/19/10 Declaration of Michael F. Koehn, Ph.D.

[32]    *See* 9/13/10 Rebuttal Report of Michael F. Koehn, Ph.D. ("Koehn Report"), Ex. C to LeVan Decl., ¶ 1.

[33]    *Id.* ¶ 5.

[34]    *Id.* ¶ 6.

[35]    *See id.* ¶ 7.

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of proof."[36] Rule 702 of the Federal Rules of Evidence states the following requirements for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 and *Daubert*, the district court must determine whether the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[37] The district court must act as "'a gatekeeper to exclude invalid and unreliable expert testimony.'"[38] However, "the Federal Rules of Evidence

---

[36] *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (discussing Rule 104(a) of the Federal Rules of Evidence). *Accord Daubert*, 509 U.S. at 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76, and explaining that the proponent of expert testimony must prove admissibility by a preponderance of proof).

[37] 509 U.S. at 597. *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

[38] *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999)). *Accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton IV*"), 525 F. Supp. 2d

favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system."[39]  In serving its gatekeeping function, the court's focus must be on the principles and methodologies underlying the expert's conclusions, rather than on the conclusions themselves.[40]  In assessing an expert's methodology, courts may consider (1) "whether [the method or theory] can be (and has been) tested," (2) "whether [it] has been subjected to peer review and publication," (3) "the known or potential rate of error [associated with the technique] and the existence and maintenance of standards controlling the technique's operation," and (4) whether the method has achieved "general acceptance" with the relevant community.[41]

---

558, 561-65 (S.D.N.Y. 2007) (discussing district court's "special obligation" to gatekeep with respect to expert evidence).

        Additionally, expert testimony may not usurp the role of the court in determining the applicable law.  *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).  Although an expert "may opine on an issue of fact," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Expert testimony is also inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

[39]    *Vuitton IV*, 525 F. Supp. 2d at 562 (citation and quotation marks omitted).

[40]    *See Daubert*, 509 U.S. at 595.

[41]    *Id.* at 592-95.

The courts' gatekeeping function under *Daubert* applies not only to "scientific" evidence, but also to proffers of "technical, or other specialized knowledge" under Rule 702.[42]  The objective of this function is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[43]  However, recognizing that "there are many different kinds of experts, and many different kinds of expertise," the Supreme Court has emphasized that the reliability inquiry "is a flexible one."[44]  Accordingly, the factors "identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[45]  Ultimately, the inquiry "depends upon the particular circumstances of the particular case at issue."[46]  In sum, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that

---

[42]  *See Kumho Tire*, 526 U.S. at 141.

[43]  *Id.* at 152.

[44]  *Id.* at 150.

[45]  *Id.* (quotations omitted).

[46]  *Id.*

expert's relevant testimony is reliable."[47]

In addition, Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."[48]

## IV.    DISCUSSION

Plaintiffs and JPMC offer expert testimony concerning the prudence of JPMC's decision to invest in and hold Sigma MTNs.  They challenge their adversary's experts partially on the basis of the four criteria listed in *Daubert*. However, the question of whether an investment manager, acting as a fiduciary, acted "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like

---

[47]    *Id.* at 152 (emphasis in original).

[48]    *Id.* (quotation marks omitted).

aims"[49] is not susceptible to determination by a scientific formula or mathematical calculation. Rather, it includes questions such as whether the fiduciary "exercise[d] independent judgment when making investment decisions" and whether the fiduciary "act[ed] in a manner as would others who have a capacity and familiarity with such matters."[50] Accordingly, a determination of the reliability of the proffered experts' testimony, while using the illustrative *Daubert* criteria where appropriate, ultimately concerns whether the proffered experts "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[51] Because the proffered experts have ample experience in the relevant fields and employ the same techniques in their proffered testimony as they do in practice I conclude, with limited exceptions, that their testimony is sufficiently reliable to be admissible under Rule 702 and *Daubert*.

###    A.    JPMC's Challenges to Plaintiffs' Experts

###        1.    Failure of Plaintiffs' Experts to Value the Sigma MTNs

---

[49]    29 U.S.C. § 1104(a)(1)(B).

[50]    *Board of Trs. of Local 295/Local 851-IBT Emp'r Pension Fund v. Callan Assocs., Inc.*, No. 97 Civ. 1741, 1998 WL 289697, at *3 (S.D.N.Y. June 4, 1998).

[51]    *Kumho Tire*, 526 U.S. at 152.

JPMC contends that the purported expert opinion – offered by O'Driscoll, Nigro, and Professor Black – that it was imprudent of JPMC to hold the Sigma MTNs is methodologically flawed and irrelevant. According to JPMC, an expert must assess the prudence of JPMC's decision to hold the MTNs by "determining the value of the notes—comparing the available sale price to the amount the notes were expected to yield if held to maturity" during the relevant period.[52] Specifically, JPMC contends the proper inquiry would be to determine (1) the value of the MTNs, based on information available at the time and accounting for the risk of default and the likely recovery upon default; (2) the price the MTNs could be sold for, considering market conditions at the time; and (3) whether the MTNs could have been sold at a price exceeding their value.[53] Although plaintiffs' experts conceded that it was important to compare the value of the MTNs to the prices at which they could be sold, plaintiffs' experts failed to value the MTNs for any date during the relevant period. JPMC contends that their opinion – simply that it was too risky to hold the MTNs – is fatally flawed because it fails to examine the alternatives to holding the MTNs.

---

[52]    Defendant's Memorandum of Law in Support of Its Motion *In Limine* to Exclude Certain Expert Testimony of Bernard Black, Fiachra O'Driscoll, and Daniel Nigro ("JPMC Mem.") at 1.

[53]    *See id.* at 2.

16

Plaintiffs initially respond by arguing that JPMC's proposed analysis is impossible because information about the specific securities held in Sigma's portfolio was unavailable.[54] This argument lacks merit. JPMC, in fact, argues that plaintiffs' experts failed to use a proper methodology because they did not "determine the value of the MTNs . . . *based on the information available to Securities Lending at the time*."[55] Thus, JPMC's attack is not based on plaintiffs' failure to consider unascertainable facts to value the MTNs, but rather a failure to value the MTNs based on the information available to JPM Securities Lending at the time.

Plaintiffs also argue that their experts' methodology is proper because it focuses on evaluating "what limited analysis [JPMC] actually conducted during the relevant time."[56] Plaintiffs contend that because JPM Securities Lending never obtained specific bids on the Sigma MTNs it would be improper to exclude plaintiffs' experts for not performing a financial analysis that JPMC never conducted at the time. Accordingly, plaintiffs argue that their experts' opinions

---

[54]     Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion *in Limine* to Exclude Certain Expert Testimony of Bernard Black, Fiachra O'Driscoll, and Daniel Nigro ("Pl. Opp. Mem.") at 3-4.

[55]     JPMC Mem. at 1.

[56]     Pl. Opp. Mem. at 1.

should not be excluded because the lack of data to properly value the MTNs reflects the information available to JPM Securities Lending at the relevant time.

Both JPMC and plaintiffs agree that the proper inquiry focuses on the information available to JPM Securities Lending at the relevant time, without the benefit of hindsight.[57]  Accordingly, an inquiry into the prudence of JPMC's conduct may properly include a critique of JPM Securities Lending's analysis of the Sigma MTNs.[58]  Plaintiffs' experts have the necessary experience and qualifications to make such a critique[59] – Professor Black has testified extensively on finance,[60] O'Driscoll led Credit Suisse's SIV restructuring efforts during the

---

[57]    *See McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396, 411-12 (S.D.N.Y. 2010) (" Because defendants' decisions were objectively appropriate in light of then-prevailing circumstances, subjective disagreement or speculation regarding their motivations does not render their actions imprudent or unreasonable.").

[58]    *See Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (holding that the proper inquiry looks into whether the fiduciary "'at the time [it] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'") (quoting *Donovan v. Maxilla*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

[59]    *See Kumho Tire*, 526 U.S. at 156 (holding that proffered experts may "draw a conclusion from a set of observations based on extensive and specialized experience").

[60]    *See* 8/10 List of Expert Reports, Depositions and Trial or Arbitration Testimony of Bernard Black, Ex. B to Black Report.

relevant time,[61] and Nigro has spent over twenty years as a portfolio manager analyzing ABS and MBS.[62] Nor does JPMC actually contest the admissibility of such an opinion.

Whether plaintiffs' experts may offer an opinion that JPM Securities Lending's analysis was deficient, however, begs the question as to whether they may offer the opinion that JPMC contests – that JPM Securities Lending's decision to hold the MTNs was imprudent. Although plaintiffs have not offered as thorough an analysis as JPMC believes is necessary, this goes to the weight, rather than the admissibility, of the experts' testimony and is properly attacked on cross-examination.[63]

In light of the experience of plaintiffs' experts and their knowledge of the SIV markets during the relevant time period,[64] their opinion that JPMC's decision to hold the Sigma MTNs was imprudent is certainly not so flawed as to

---

[61]    *See* O'Driscoll Resume.

[62]    *See* Nigro Decl. ¶ 1.

[63]    *Cf. In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009) ("As the Second Circuit has repeatedly counseled, concerns about the adequacy of data underpinning an expert opinion are best addressed via cross-examination.").

[64]    *See Kumho Tire*, 526 U.S. at 156 (holding that proffered experts may "draw a conclusion from a set of observations based on extensive and specialized experience").

require exclusion under *Daubert*. O'Driscoll, in his capacity restructuring SIVs at Credit Suisse, was intimately acquainted with the SIV market during the relevant period. He has first-hand knowledge of sales of Sigma MTNs. Because JPM Securities Lending did not actually attempt to sell the MTNs, there is no direct evidence of what prices JPM Securities Lending could have received for the notes. O'Driscoll's opinion, based on his familiarity with the active market in Sigma MTNs through mid-September 2008, is helpful to the finder of fact because of the absence of such direct evidence.

Moreover, Professor Black does explore alternatives that JPM Securities Lending could have pursued in lieu of holding the MTNs. Professor Black offers an opinion that JPM Securities Lending acted imprudently by not engaging in privately-negotiated ratio trades with Sigma, which would be preferable to holding the Sigma MTNs.[65]

These experts do not merely make conclusory statements based on their experience,[66] but rather offer detailed analyses to substantiate their

---

[65]     *See* Black Report at 40 ("JP Morgan was in an excellent position to negotiate a large ratio trade that would have protected Securities Lending against the cliff risk, on terms that would lead to little or no loss of principal.").

[66]     *See Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001) (holding that an expert "must do more than aver conclusorily that his experience led to his opinion") *abrogated on other grounds by Casey v. Merck & Co. Inc.*, 653 F.3d 95, 100 (2d Cir. 2011).

conclusions. Accordingly, plaintiffs' experts may offer an opinion that JPM

Securities Lending's decision to hold the MTNs was imprudent. The experts'

failure to value the Sigma MTNs and compare the value to market prices is

appropriately dealt with on cross-examination.

### 2. Professor Black's "Repo Cliff"

Professor Black uses the metaphor of a "repo cliff" to illustrate the

danger Sigma faced as it increased its levels of repo financing. Professor Black

describes repo financing and the "repo cliff" as follows:

> The repo alternative worked like this. To pay the first $10 in maturing debt, Sigma would pledge assets to a repo financier. This was permitted, as long as Sigma obtained financing equal to at least 90% of the market value of assets. The repo financier would charge a fee, and might value the assets at less than Sigma did, say at 85% of face (call this "repo collateral value"). The actual fees were complex and not easy to disentangle from interest payments, but a reasonable approximation is an annual fee of around 1%, largely paid up front. The repo lender would therefore take possession of assets with $11.11 in repo collateral value, and lend $10.10 to Sigma, of which Sigma would pay $0.10 to the repo lender as its 1% fee. The market value of the pledged assets would be $11.75; their face value would be $13.06: So, if Sigma initially had assets with face value of $105 and market value of $94.50, then after the repo transaction, it would have unpledged assets with face value of $91.84 and market value of $82.66. After the first repo transaction, it[s] ratio of unpledged assets/debt had dropped from 105% to 102% based on face value, and from 94.5% to 91.8% based on estimated market value.

> Now repeat 6 more times. By the end, Sigma has left only $13.58 in unpledged assets, to cover its remaining $30 in debt. The repo

lenders then say, enough already, declare a default, seize the collateral, and sell it. In theory, if they sell the collateral for more than the $70 that Sigma owes them, they should pay the excess to Sigma. In practice, they have no incentive to collect any more than the $70 they need to cover their loan, and likely will return little or nothing to Sigma. To make matters worse, the repo lenders will have cherry picked Sigma's better, more liquid assets. The limited remaining assets will be worth less than their face value of $8.58, perhaps substantially less.

By relying so heavily on repo, Sigma was heading toward a cliff. If market values and liquidity recovered before it ran out of assets to pledge to repo lenders, it might recover. If not, the value of its remaining senior notes would crash when the repo lenders pulled the plug. As Sigma continued through 2007 and 2008, building up more and more repo, while the market values of its assets fell, it should have been increasingly clear that the likely ending was bad.[67]

At his deposition, Professor Black testified about the "repo cliff" as follows:

> Q.    What's a repo cliff?
> A.    This is a term that I use in my expert report in this case to describe, in colloquial fashion, if you will, a risk that Sigma's . . . use of repurchase agreement – which I will call "repo," if I may – in order to finance its operations. I use this term to describe a risk that that manner of financing posed to the eventual recovery for the longer dated Sigma senior Notes . . . .
> Q.    Who has previously used the concept of repo cliff, to your knowledge?
> A.    I made it up.
> Q.    You made it up. Just for this case?
> A.    I made it up just for this case.[68]

---

[67]    Black Report at 17-18.

[68]    12/3/10 Deposition of Bernard S. Black ("Black Dep."), Ex. B to Bonderoff Decl., at 14:8-15:3.

JPMC contends that Professor Black's "repo cliff" theory should be excluded for several reasons.  *First*, courts generally require that the methodologies used by experts have been subject to peer review and are generally accepted in the relevant field.  Black fails to meet either of these requirements.  *Second*, courts are especially skeptical of methodologies created solely for purposes of litigation. *Third*, courts generally exclude untestable opinions.  Here, Black has only identified broad factors suggesting that a security issuer faces a "repo cliff" without specifying when and how these factors create an unacceptable risk to the stability of an investment, thus rendering the theory untestable.

Plaintiffs contend that what Professor Black "made up" for purposes of this litigation is only the term "repo cliff."  Although Professor Black was being asked about the "*concept* of repo cliff,"[69] rather than the term "repo cliff," it is apparent that what is novel is Professor Black's metaphor.

Although new methodologies created for purposes of litigation are disfavored,[70] Professor Black's repo cliff theory is admissible.  The essence of

---

[69]     *Id.* (emphasis added).

[70]     *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 561 (S.D.N.Y. 2008) (excluding expert testimony where the proffered expert could "not name another scientist who ha[d] ever employed, much less approved of" his method and "had never used it in his day-to-day work, or applied it").

Black's theory is that the amount of collateral pledged to repo financiers detracts from the value of senior debt because it limits the amount of assets available to senior lenders in a liquidation and that excessive amounts of repo financing should be of concern to an investment manager. JPMC cannot demonstrate that this theory is flawed or lacks support among economists and financial analysts.[71] To the extent the "repo cliff" theory is imprecise, JPMC may cross-examine Professor Black about his theory and argue that Professor Black has not and cannot identify the precise point at which repo financing becomes so excessive that one falls off the "repo cliff." These points go to weight rather than admissibility. Because the "Federal Rules of Evidence favor the admissibility of expert testimony, and [the

---

[71] *See, e.g.*, Sam Jones, FT Alphaville, *SIVs repo what they sow* (Sept. 12, 2007) ("Repos – repurchasing agreements – are essentially a super-senior form of debt. Rather than use assets as collateral for loans, repos literally sell the assets themselves. The assets are bought from the borrower and sold back for more at an agreed later date. Naturally, of course, that has existing SIV note holders worried, because it subordinates them in the capital structure. If a SIV with repo financing went into defeasance – those repo assets wouldn't be coming back. Investors were noticeably concerned at the end of Moody's teleconference."), *available at* http://ftalphaville.ft.com/blog/2007/09/12/7241/sivs-repo-what-they-sow/; *cf.* Viral Acharya, Professor of Finance, Stern School of Business, New York University, Arvind Krishnamurthy, Harold Stuart Professor of Finance, Kellogg School of Management, Northwestern University, & Enrico Perotti, Professor of International Finance, University of Amsterdam, *A Consensus View on Liquidity Risk* (Sept. 14, 2011) ("Financial claims such as repos and derivatives enjoyed broader privileges to repossess collateral and resell it immediately upon default since the reform of US and EU bankruptcy rules in 2005. Since then, massive growth in these funding and hedging strategies has increased contingent liquidity risk."), *available at* http://www.voxeu.org/index.php?q=node/6973.

court's] role is not intended to serve as a replacement for the adversary system"[72] Professor Black's "repo cliff" theory is admissible.

### 3. Professor Black's Opinions Concerning State of Mind

JPMC also seeks to preclude Professor Black from making certain statements that purportedly "offer speculation about the state of mind and motivations of JPMC . . . or individual witnesses."[73] JPMC contends that such opinions are improper subjects for expert testimony. Plaintiffs respond that the challenged statements are not speculations about state of mind; rather, they are statements that rest on the factual record.

There is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion.[74] Accordingly, any such statements will not be permitted at trial. JPMC gives the following statements from Professor Black's report as examples of improper state-of-mind opinions:

---

[72] *Vuitton IV*, 525 F. Supp. 2d at 562 (citation and quotation marks omitted).

[73] JPMC Mem. at 21.

[74] *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert testimony where proffered expert interjected "his opinion as to the state of mind and knowledge possessed by defendants and non-parties to this action"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (holding inadmissible expert testimony concerning "intent, motives or state of mind").

1.  JPM Securities Lending largely relied blindly on [Lisa Shin's] advice[75]

2.  [James Wilson] understood even less about Sigma's model and its risks than Ms. Shin did[76]

3.  Shin knew of Fitch's ratings withdrawal but was untroubled[77]

4.  [Shin and Wilson] understood neither the odds nor the game[78]

5.  [Shin and Wilson] appeared to assume that the only options were to sell Sigma notes at market prices or accept the ratio trades that Sigma was offering[79]

6.  [Wilson] didn't know how to assess when to sell (or ratio trade) and when to hold. He didn't know how to approach Sigma, to propose a ratio trade. So he held, and hoped for the best.[80]

7.  Before the 2007 financial crisis, securities lending was a sleepy, apparently safe backwater. Not someplace one would put stars.[81]

The first contested statement – that JPM Securities Lending "relied blindly" on Shin – is excluded from Black's report because the word "blindly" impermissibly draws an inference as to JPM Securities Lending's state of mind.

---

[75]   Black Report at 24.

[76]   *Id.*

[77]   *Id.* at 25.

[78]   *Id.* at 36.

[79]   *Id.* at 40.

[80]   *Id.* at 42.

[81]   *Id.*

While Professor Black may permissibly opine that JPM Securities Lending's due diligence did not comply with industry standards, whether JPM Securities Lending relied "blindly" on Shin is an inference for the finder of fact to draw.

The second contested statement – that Wilson understood Sigma less than Shin – is permissible because it is clearly based on the record.  Wilson testified that he was not directly involved in the decision to purchase Sigma, and he referred questions about the financial reporting of SIVs, such as Sigma, to Shin.[82]  However, Professor Black may not testify to this as his expert opinion.  Rather, he can reference this fact in the record as the *basis* for his ultimate opinion.

The third contested statement – that Shin was untroubled by Fitch's ratings withdrawal – is an impermissible expert opinion going to state of mind.  Again, it is proper for an expert to observe that Shin did not investigate Fitch's withdrawal and offer an opinion that this behavior was in contravention of industry standards.  However, because plaintiffs point to no explicit statement by Shin that she was "untroubled" by Fitch's withdrawal, this is an inference that the finder of fact may choose to accept or reject.

---

[82]  *See* 6/29/10 Deposition of James Wilson, Ex. M to 10/11/11 Declaration of Peter H. LeVan, Jr., plaintiffs' counsel, in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion *In Limine* to Exclude Certain Expert Testimony of Bernard Black, Fiachra O'Driscoll, and Daniel Nigro ("LeVan Opp. Decl."), at 65, 72-73.

The fourth contested statement – that Shin and Wilson "understood neither the odds nor the game" – is also not a proper expert opinion. Although it is proper for Professor Black to critique Shin's recovery analysis by pointing to flawed assumptions and inaccurate estimates, the conclusion that Shin and Wilson "understood neither the odds nor the game" is properly reserved for the finder of fact.

The fifth contested statement – that Shin and Wilson "appeared to assume" that their only options were to sell the Sigma MTNs at market prices or accept Sigma's ratio trades – is improper. Professor Black may testify as to Shin's and Wilson's failure to adequately research alternative measures, such as a privately negotiated ratio trade. However, testimony concerning what Shin and Wilson "appeared to assume," without any supporting testimony from Shin or Wilson stating that they only considered selling the Sigma MTNs at market prices or accepting Sigma's proposed ratio trades, once again draws inferences that should be left to the finder of fact.

The sixth contested statement – that Wilson held the Sigma MTNs and "hoped for the best" because he did not know when to sell or ratio trade – is improper. Plaintiffs fail to point to anything in the record that clearly shows Wilson did not know how to propose a ratio trade or when to sell or ratio trade.

Professor Black may testify that Wilson never sold an asset during his career, but he lacks any basis to testify that Wilson did not "know" how to approach Sigma about a ratio trade, or how to assess a decision to buy or hold. These are inferences that may be drawn by the finder of fact.

The seventh, and final, contested statement – that securities lending was a "sleepy, apparently safe backwater" and not a place for "stars" – is also excluded. Professor Black is a lawyer and law professor, without any experience as a financial analyst or portfolio manager.[83] Having never worked at a bank, Professor Black's statement about whether "stars" would be placed in securities lending falls outside his area of professional expertise.

### 4. O'Driscoll's Bloomberg Screen Shot

O'Driscoll offers an opinion that "[b]y July 2008, certain purchasers continued demanding the Sigma MTNs at prices of $76/79" and cited to a Bloomberg screen shot from July 14, 2008 to support this proposition.[84] JPMC seeks to preclude O'Driscoll from offering any testimony based on an incomplete Bloomberg screen shot. JPMC contends that this is not the type of facts or data that is "reasonably rel[ied]" upon by "experts in the particular field" in forming

---

[83]     *See* Black Dep. at 5:17-19, 47:14-22, 53:9-19.

[84]     O'Driscoll Report at 15; *see also* 7/14/08 Bloomberg screen shot, Ex. 3 to O'Driscoll Report.

opinions or inferences on the subject.[85]  O'Driscoll was unable or unwilling to

identify the source of the screenshot and acknowledged that it did not reflect an

actual purchase or sale of Sigma MTNs.  He could not "guarantee . . . that any of

the information on this is reliable."[86]

Plaintiffs argue that JPMC received the bid contained in the

Bloomberg screen shot and produced an unsolicited marketing e-mail, containing

the same information.[87]  This is immaterial.  Simply because JPMC received an

unsolicited e-mail, does not make the contents of the e-mail or screenshot a reliable

basis for an expert opinion.  This is especially true where the expert does not know

the source of the documents and cannot guarantee its reliability.

The Bloomberg screenshot, by O'Driscoll's own admission, is not the

type of evidence upon which a reasonable expert would rely.  Accordingly,

O'Driscoll is precluded from testifying about the screenshot or offering an opinion

that "[b]y July 2008, certain purchasers continued demanding the Sigma MTNs at

prices of $76/79" to the extent that opinion is based solely on the Bloomberg

---

[85]     Fed. R. Evid. 703.

[86]     12/9/10 Deposition of Fiachra O'Driscoll ("O'Driscoll Dep."), Ex. F
to Bonderoff Decl., at 229:5-7.

[87]     *See* Opp. Mem. at 22; *see also* Defendant's Reply Memorandum of
Law in Support of Its Motion *In Limine* to Exclude Certain Expert Testimony of
Bernard Black, Fiachra O'Driscoll, and Daniel Nigro at 9.

screen shot.  However, O'Driscoll may offer opinions based on his knowledge of the SIV market during the relevant time period independent of the Bloomberg screen shot.

## B. Plaintiffs' Challenges to JPMC's Experts

### 1. Patricia Chadwick

Plaintiffs seek to exclude Chadwick's testimony on the grounds that her proffered opinion (1) is not her independent opinion, but is actually based on analysis, which she does not understand, performed by a third-party; (2) is based on information contained in interview notes Chadwick has destroyed; and (3) consists of inadmissible *ipse dixit*.

#### a. Third-Party Research

Plaintiffs contend that much of Chadwick's opinion is based on work done by the Analysis Group, a "third-party economic research and consulting firm hired by counsel for" JPMC.[88]  The work done by the Analysis Group went beyond the typical work permitted for expert's assistants, such as administrative support and research.  According to plaintiffs, the Analysis Group provided substantive expertise in areas where Chadwick lacked such expertise.  Chadwick bases her

---

[88]     Plaintiffs' Memorandum of Law in Support of Their Motion to Exclude Defendant's Proposed Expert Opinions of Patricia F. Chadwick and Dr. Michael F. Koehn ("Pl. Mem.") at 6.

"Recovery Analysis," which compares the expected receipts from a sale of the Sigma MTNs to the expected recovery if Sigma entered liquidation, on many assumptions. For example, Chadwick estimates the amount of collateral Sigma pledged to repo counterparties and the amount of MTN holders' claims on assets in liquidation. According to plaintiffs, the Analysis Group "did the research, provided the underlying data, and constructed those critical assumptions,"[89] and Chadwick's report merely regurgitates the recovery analysis constructed by the Analysis Group. As another example, plaintiffs argue that Chadwick relied on the Analysis Group to select a figure crucial to the recovery analysis – the ten-percent discount rate Chadwick applies to Sigma's assets in a fire-sale scenario. In addition, Chadwick relied upon the Analysis Group's substantive judgment and expertise in selecting a benchmark index to estimate the market value of Sigma's holdings – the Merrill Lynch index. Chadwick also used the S&P/LSTA Leveraged Index Loan Index, identified by the Analysis Group, where the Merrill Lynch index did not provide for a specific asset class. At her deposition, Chadwick could not explain the composition of the S&P/LSTA Leveraged Index Loan Index.

Despite plaintiffs' characterizations, the work done by the Analysis

---

[89] *Id.* at 7.

Group, a firm with which Chadwick is affiliated, falls within the permissible scope of research and data collection done by third-party assistants to experts.[90] The Analysis Group gathered data and provided research under Chadwick's supervision. Chadwick testified that she used the Analysis Group to gather data because of the subscriptions they have – "so under my supervision and describing to them what I wanted and needed, they certainly provided me with that data."[91] Chadwick testified further that "I don't think there was any analysis that I could not do on my own. What I found valuable from them was the resources of data that they had, that they had access to."[92] There is nothing improper about an expert relying on third-parties for data collection.[93]

The Analysis Group's selection of certain benchmark indices is also within the permissible scope of work done by expert's assistants.[94] The Analysis

---

[90]     *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (affirming denial of motion to exclude an expert who relied on data provided by others); *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011).

[91]     12/10/10 Deposition of Patricia Chadwick ("Chadwick Dep."), Ex. A to 10/11/11 Declaration of Samuel E. Bonderoff ("Bonderoff Opp. Decl.") at 68.

[92]     *Id.*

[93]     *See Cedar Petrochems*, 769 F. Supp. 2d at 284.

[94]     *See Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg.*, No. 05 Civ. 260, 2008 WL 3819752, at *2 (M.D. Fla. Aug. 12, 2008) (permitting expert to select pricing index in consultation with third-party "even though he does not

Group merely provided research for data underlying Chadwick's analysis. Plaintiffs do not challenge the use of the indices or propose any alternatives.

With respect to the ten-percent discount rate Chadwick applied to Sigma's assets in a fire-sale scenario, Chadwick merely asked Analysis Group to provide research on an appropriate percentage discount for a fire sale. The Analysis Group provided a peer-reviewed article with such information. The article suggested a discount between ten and twenty percent. Chadwick independently chose the ten-percent figure. Plaintiffs' counsel may cross-examine Chadwick as to why she chose a ten-percent discount instead of a twenty-percent discount. They may also question why Chadwick did not seek out any research beyond this one article. It is apparent that Chadwick has taken full responsibility for this figure.

Finally, plaintiffs argue that Chadwick does not understand her own opinion because she failed to recall the securities that a particular leveraged loan index was based upon. This argument lacks merit. Memory lapses are traditionally challenged on cross-examination.[95] An expert is not required to have

understand every detail of how it was calculated" where it was "the type of data reasonably relied upon by experts in the mortgage servicing industry").

[95] *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 n.45 (S.D.N.Y. 2010) ("[L]apses in memory are traditionally challenged through cross-examination and do not render [expert]

memorized the complete contents of her expert report.  In sum, the work done by the Analysis Group consists of research and data collection – types of work permissibly done by third-parties for experts.

### b.    Chadwick's Interview Notes

Plaintiffs also argue that Chadwick's testimony should be precluded or limited because Chadwick relied upon interviews with Shin and Matthew Sarson, but Chadwick subsequently destroyed her notes from those interviews.  According to plaintiffs, this is a violation of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, which requires that experts disclose facts or data "considered" by a testifying expert in reaching a conclusion.[96]  Plaintiffs also argue that precluding Chadwick from testifying is an appropriate sanction for violating Rule 26(a)(2)(B) because Chadwick relies on these interviews in support of key propositions[97] and the interviews also provided background information throughout the report that is not specifically cited.

---

opinion testimony unreliable.").

[96]    In this case, there was a stipulation that parties would only disclose notes "relied" upon by experts in reaching their conclusion. *See* Undated Stipulation Regarding Discovery of Certain Types of Expert Witness Information, Ex. G to Bonderoff Opp. Decl.  Accordingly, the production obligation under Rule 26(a)(2)(B) only applies to those portions of the Shin and Sarson interviews upon which Chadwick relied.

[97]    *See* Chadwick Report nn. 118, 119, 197.

JPMC's counsel had an obligation to remind Chadwick to "preserve and produce documents subject to the expert protocol."[98]  This obligation concerns all information relied upon by Chadwick in forming her opinion.  Chadwick relied upon the interviews[99] and, while her testimony is not conclusive, it appears likely that she destroyed her notes.[100]  Regardless of what exactly happened with any supposed interview notes, JPMC's counsels' failure to ensure that Chadwick exercised more caution with her discovery obligations "merits this Court's disapproval."[101]

In this situation, however, preclusion is not an appropriate remedy. The contents of the interviews upon which Chadwick relies are incorporated into the body of Chadwick's report – Chadwick cites the interviews four times, and in each instance Chadwick specifically describes the information from the interview on which she is relying.[102]  Where the substance of the interviews is incorporated into the body of the report, exclusion is not an appropriate remedy for failure to

---

[98]     *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 500.

[99]     *See* Chadwick Report nn. 118, 119, 197.

[100]     *See* Chadwick Dep. at 124-128 (testifying that she "may have" taken notes of Shin's and Sarson's interviews and that such notes are "probably nonexistent now since my report's done and I tend to get rid of my notes").

[101]     *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 499.

[102]     *See* Chadwick Report ¶¶ 90, 92, 160.

36

produce interview notes.[103]  Moreover, Shin and Sarson have been extensively

deposed by plaintiffs, and will be available for further questioning at trial.

Plaintiffs' caselaw is easily distinguishable.  In *Fidelity National Title Insurance*

*Co. v. Intercounty National Title Insurance Co.* an expert relied on interviews

where the interviewed witnesses refused to testify at trial on Fifth Amendment

grounds.[104]  Here, Shin and Sarson have already provided deposition testimony

under oath.  Plaintiffs have made no showing that they have been prejudiced by

Chadwick's destruction of the notes such that preclusion of Chadwick's testimony

is appropriate.

### c.  Chadwick's Opinions Are Not *Ipse Dixit*

Finally, plaintiffs argue that Chadwick's opinions should be excluded

because they constitute inadmissible *ipse dixit*.  With regards to her opinion on

JPMC's decision to purchase the Sigma MTNs, plaintiffs attack Chadwick's credit

analysis.  Plaintiffs claim that Chadwick's analysis of Sigma's (1) viability and

stability; (2) quality of underlying assets; (3) protection to investors, and (4)

---

[103]    *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 242 (S.D.N.Y.
2010); *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 499-500.

[104]    *See Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 412
F.3d 745, 750 (7th Cir. 2005).  Even though the interviewed witnesses would not
testify at trial, the court held that exclusion was not warranted because any
prejudice from destruction of the notes was outweighed by prejudice from
exclusion of the expert.  *See id.* at 752-53.

reputation of management amounts to unsupported broad conclusions.  According

to plaintiffs, Chadwick fails to cite any authority supporting her credit analysis and

jumps to the conclusion that the MTNs would be reasonable to include in a

securities lending portfolio after noting their ratings.

Likewise, plaintiffs contend that Chadwick offers no support for her

opinion that JPMC's decision to purchase the MTNs was based upon robust due

diligence within industry standards.  With regards to JPMC's decision to hold the

MTNs, plaintiffs assert that Chadwick similarly jumps to broad conclusions.

Plaintiffs also attack Chadwick's opinion casting repo financing as a sign of

Sigma's financial health because Chadwick simply puts a positive spin on negative

events without any support.  These characterizations are inaccurate.

Although courts may exclude "opinion evidence which is connected

to existing data only by the *ipse dixit* of the expert,"[105] plaintiffs fail to identify any

gap between Chadwick's data and Chadwick's opinion sufficient to justify

exclusion.  Plaintiffs' mere disagreement with Chadwick's conclusions is

insufficient to render her opinions inadmissible *ipse dixit*.

Chadwick's opinion concerning JPMC's decision to purchase the

---

[105]     *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that
expert opinion may be excluded if "there is simply too great an analytical gap
between the data and the opinion proffered").

Sigma MTNs is supported by her extensive credit analysis.  Although plaintiffs attack Chadwick for not citing authority for the four common-sense factors Chadwick believes an investment advisor should consider when deciding whether to purchase an a security, plaintiffs do not dispute Chadwick's methodology, propose an alternative, or contend that Chadwick fails to consider material information available at the time.  Accordingly, plaintiffs have made no showing that Chadwick has failed to exercise the "intellectual rigor" of an expert in investment management.[106]

Moreover, Chadwick offers sufficient support to show that her opinion is consistent with the practice of experts in the field and is not *ipse dixit*. *First*, Chadwick does cite to authority to support the fourth prong of her credit analysis – an inquiry into the reputation of management.[107]  *Second*, Chadwick has ample experience to support her opinion.  Chadwick states that her analysis of

> the reasonableness of investment decisions is based on my training and experience in the industry and my understanding of what a competent and informed professional might do in similar situations.  This evaluation, in turn, depends on the governing investment guidelines, the stated risk/return preferences of the clients, and the overall purposes of the investment–here, as part of

---

[106]     *Kumho Tire*,  526 U.S. at 152.

[107]     *See* Chadwick Report ¶ 74.

a securities lending program.[108]

The experience on which Chadwick bases her opinion consists of eighteen years as a portfolio manager, managing approximately five billion dollars in assets.[109] Moreover, Chadwick does not offer a conclusory opinion that JPMC acted reasonably based solely on her experience;[110] rather, as discussed below, Chadwick reviews and analyzes the relevant information available to JPMC at the time, while drawing on her relevant experience to inform her analysis.[111] *Third*, her opinion is also based on AFTRA's investment guidelines. After considering the permissible investments, quality guidelines, concentration guidelines, and maturity guidelines under the applicable investment guidelines, Chadwick concludes that "compliance with the guidelines at the time of purchase is compelling evidence that JPMorgan's purchase decision was consistent with its clients' risk/reward preferences."[112] *Fourth*, Chadwick supports her opinion that JPMC acted reasonably in purchasing the Sigma MTNs by surveying the decisions made by other institutional investors

---

[108] Chadwick Report at 3.

[109] *See Kumho Tire*, 526 U.S. at 156; Chadwick Report ¶ 2.

[110] *Cf. Primavera Familienstifung*, 130 F. Supp. 2d at 530.

[111] *See Kumho Tire*, 526 U.S. at 156 (holding that proffered experts may "draw a conclusion from a set of observations based on extensive and specialized experience").

[112] Chadwick Report ¶ 40.

at the same time.[113]

Plaintiffs' assertion that Chadwick's opinions concerning the quality and diversification of Sigma's assets are *ipse dixit* also fails. Chadwick based her opinions concerning the quality of Sigma's assets on all information available to JPMC at the time – such as classes of assets in Sigma's portfolio.[114] Chadwick's reliance on Sigma's credit rating was just one part of the inquiry; Chadwick does not render an opinion on the quality of Sigma's assets solely based on the rating agencies' ratings. Chadwick's opinion concerning the diversification of Sigma's portfolio again is based on information available to JPMC at the relevant time – from Sigma's monthly and annual business reports and from the rating agencies. Chadwick cites to the diverse sectors of assets held by Sigma and the percentages of Sigma's assets made up of certain sectors.[115] Chadwick also considered that "Sigma's portfolio was . . . diversified across maturities" and limited in exposure to individual issuers.[116] Moreover, Chadwick considered that the underlying assets "were also diversified across U.S., British, French, German and Australian

---

[113]   *See id.* ¶¶ 76-80.

[114]   *See id.* ¶ 58.

[115]   *See id.* ¶ 67.

[116]   *Id.* ¶ 68.

markets, among others."[117]  Again, the fact that Chadwick is not able to identify the specific assets held by Sigma does not preclude her from offering an opinion that Sigma's underlying assets were diversified based on information available to the public at the time.

With regards to JPMC's due diligence efforts, Chadwick concludes that JPMC's due diligence was "consistent with best practices in the industry."[118] Chadwick bases this conclusion on JPMC's (1) review of materials provided by Sigma and other SIVs, such as financial statements and business reports; (2) review of credit rating reports; (3) independent analyses monitoring liquidity trends and capital adequacy; and (4) communications with the issuer and periodic on-site diligence.[119]  Chadwick concludes, based on her ample experience, that these are the types of information a diligent credit analyst should review and the types of analysis a diligent credit analyst should perform.[120]

Finally, Chadwick's opinions concerning JPMC's decision to hold the Sigma notes are not *ipse dixit*.  They are supported by a detailed analysis.  In

---

[117]    *Id.* ¶ 68.

[118]    *Id.* ¶ 91.

[119]    *See id.* ¶ 90; *see also id.* ¶¶ 160-162 (discussing ongoing due diligence efforts while JPMC held the Sigma MTNs).

[120]    *See id.* ¶ 91; *see also id.* ¶ 162 (concluding, based on Chadwick's experience, that the ongoing analysis was "thorough and rigorous").

assessing JPMC's decision to hold, Chadwick considers (1) the likelihood of a Sigma default; (2) the likely recovery in event of default; (3) the likely proceeds from the sale of the Sigma MTNs; and (4) macroeconomic factors, such as the worldwide credit crisis.[121]  Over the span of twenty-three pages, Chadwick assesses these factors at various points in time from June 2007 to September 2008.[122]  In addition, Chadwick considers the responses of other market participants at the same time.[123]  Plaintiffs merely disagree with Chadwick's conclusion, and they may probe her analysis on cross-examination and offer experts with contrary opinions; however, this is not grounds for excluding an opinion as *ipse dixit*.[124]

Likewise, plaintiffs disagree with Chadwick's opinion that Sigma's ability to obtain repo financing was a positive sign.  Chadwick may present an opinion that an ability to obtain financing during a liquidity crisis is a positive sign. On the other hand, plaintiffs may present the negative inference that might arise from repo financing – that Sigma was on the edge of a "repo cliff."  The finder of fact is entitled to determine which inference to draw.

---

[121]     *See id.* ¶¶ 97-98.

[122]     *See id.* ¶¶ 99-152.

[123]     *See id.* ¶¶ 153-159.

[124]     *See Emig v. Electrolux Home Prods. Inc.*, No. 06 Civ. 4791, 2008 WL 4200988, at *9 (S.D.N.Y. Sept. 11, 2008) (holding that deficiencies in "support and detail for the conclusions" are an issue of weight rather than admissibility).

### 2. Dr. Michael F. Koehn

Finally, plaintiffs seek to exclude Dr. Koehn's testimony to the extent it relies on Chadwick's analysis. Because I have held that Chadwick's opinion is admissible, Dr. Koehn's reliance on Chadwick's opinion is not grounds for exclusion.

## V. CONCLUSION

For the aforementioned reasons, JPMC's motion is granted in part and denied in part, and plaintiffs' motion is denied. The Clerk of the Court is directed to close these motions [Docket Nos. 105 and 108].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     December 14, 2011
           New York, New York

**For Plaintiffs:**

Joseph H. Meltzer, Esq.
Peter H. LeVan, Jr., Esq.
Barroway Topaz Kessler Meltzer &
    Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Bradley E. Beckworth, Esq.
Brad Seidel, Esq.
Nix Patterson & Roach, LLP
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333

Milo Silberstein, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

David L. Wales, Esq.
Bernstein, Litowitz, Berger &
    Grossman, LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

Gregory M. Nespole, Esq.
Wolf Haldenstein Adler Freeman
    Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4761

**For JPMC:**

Lewis Richard Clayton, Esq.
Jonathan H. Hurwitz, Esq.
Samuel E. Bonderoff, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3215